Joan CANNON and Leila Jeanne Hill, Plainntiffs–Appellants,

and

Terry Sullivan and Ray C. Williams, Proposed Plaintiffs–Appellants,

v.

The CITY AND COUNTY OF DENVER; D.M. Ryan, individually and as a police officer; D.C. Baca, individually and as a police officer; The Police Department of the City and County of Denver, Defendants–Appellees.

No. 90–1016.

United States Court of Appeals, Tenth Circuit.

July 12, 1993.

868

C. Peter Thomas S. Cornell of Free Speech Advocates, New Hope, KY (Jay Alan Sekulow, Thomas Patrick Monaghan and Walter M. Weber of Free Speech Advocates, New Hope, KY, and Charles J. Onofrio, Denver, CO, with him on the brief), for plaintiffs-appellants and proposed plaintiffs-appellants.

Theodore S. Halaby, Denver, CO (Robert M. Liechty, Denver, CO, with him on the brief), for defendants-appellees.

Before SEYMOUR, HOLLOWAY and ANDERSON, Circuit Judges.

HOLLOWAY, Circuit Judge.

The plaintiffs-appellants Joan Cannon (Cannon) and Leila Jeanne Hill (Hill) brought this action under 42 U.S.C. § 1983 against the City and County of Denver and individual police officers Donna Ryan–Fairchild (Ryan–Fairchild) and Paul Baca (Baca), who arrested them for disturbing the peace when they were carrying signs reading "The Killing Place" outside a Denver abortion clinic. Plaintiffs alleged that their arrests violated their First Amendment rights and they also asserted a number of state tort claims. The district court granted summary judgment for the defendants as to Cannon's and Hill's federal claims and then exercised its discretion and dismissed the pendent state claims without prejudice. The court denied a motion for reconsideration and a motion for leave to amend the complaint. Appeal was timely taken to this court.

I

On January 26, 1988, Officers Baca and Ryan–Fairchild arrested Cannon and Hill during an anti-abortion protest on a sidewalk in front of a clinic operated by Rocky Mountain Planned Parenthood. The clinic had been the object of long-standing, regular protests during the previous months. Hill had herself been arrested some months before and charged with trespass and assaulting a patient. On the day in question Officer Ryan–Fairchild was off duty, but in uniform, and was serving as a private security guard hired by the clinic. Officer Baca had been passing by the scene when he stopped to monitor the protest.

A number of protestors were marching along the sidewalk in front of the building. Some were carrying signs with the words "The Killing Place." People entering the clinic could see these signs and at one point a man accompanying a patient to the clinic began shouting at the protestors and was physically restrained by Officer Ryan–Fairchild. Ryan–Fairchild said that about a week earlier she contacted Officer Yates on another matter and Yates told Ryan–Fairchild that Denver County Court Judge Soja had commented that words tending to incite would be fighting words: "In other words, saying baby killer, murderer, killing in any regard." Officer Ryan–Fairchild said she was told that Judge Soja had made a ruling about disturbances at the clinic and this was his ruling. I R. Doc. 7, Ex. B at 8. Ryan–Fairchild communicated this information to Officer Baca. As we explain later, infra note 8, the judge described his statements differently, saying he did not make a "ruling" on the subject. After Cannon and Hill refused the officers' request to cover the words "The Killing Place" on their signs, the officers arrested them. Cannon and Hill were charged with disturbing the peace in violation of Denver Revised Code § 38–89 and were both incarcerated for approximately eight hours. The charges were later voluntarily dismissed.

In the district court plaintiffs sought damages under 42 U.S.C. § 1983 for violation of their First Amendment rights and declaratory and injunctive relief under 28 U.S.C. § 2201. The complaint also averred state tort claims of false arrest, false imprisonment, assault and battery, tortious violation of state constitutional rights, intentional infliction of emotional distress, and malicious prosecution.[1]

After discovery, the defendants moved for summary judgment. In his order granting summary judgment for defendants on the § 1983 federal claims, the district judge analyzed the claims, stating that "[t]he contours of First Amendment freedoms are organic and difficult, if not impossible, to pinpoint." Order of Dismissal at 8. The court found that the officers did not act in violation of clearly established law. It therefore concluded that the officers were entitled to qualified immunity. The court also determined that neither the Police Department nor the City and County of Denver could be held liable under § 1983 because there was not a sufficient showing that the claimed deprivation of First Amendment rights was the result of a municipal "policy or custom." *See Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

Having granted summary judgment for defendants on the federal claims, the court exercised its discretion to dismiss the remaining pendent state claims without prejudice.

II

On appeal, plaintiffs argue that the district judge erred in granting summary judgment for defendants, making two basic errors: (1) the judge erred in holding that the individual defendants, Officers Ryan–Fairchild and Baca, were entitled to qualified immunity, the asserted constitutional rights of plaintiffs not being clearly established; and (2) the judge erred in holding that summary judgment should be granted for the City and County of Denver on the basis that "[a]s a

matter of law this court finds that the City of Denver has not established a custom or policy of arresting citizens who engage in this type of conduct." Order of Dismissal at 12.

We review *de novo* the district court's grant of summary judgment, using the same legal standard as the trial court. *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate when the evidence indicates that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). In examining the record we view the evidence in the light most favorable to the party opposing summary judgment. *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991).

A

Section 1983 provides in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State[,] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

■ The Supreme Court has held that government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Chapman v. Nichols*, 989 F.2d 393, 397 (10th Cir.1993) ("official is protected from personal liability if his allegedly unlawful official action was objectively reasonable when assessed in light of legal rules that were clearly established when the action was taken") (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). If the law was clearly established, the immunity

---

1. The Right Reverend James Orin Mote, an Anglican Bishop, was also originally named as a plaintiff and Detective Carol Yates and Bohdan Makolondra were named as defendants. All have since been dropped from the case and are no longer parties. *See* I R. Doc. 4, at 2.

defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. "Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." 457 U.S. at 819, 102 S.Ct. at 2738. This circuit has required that "extraordinary circumstances" of the type claimed here—legal advice in effect—be such that defendant was so "prevented from knowing that his actions were unconstitutional that he should not be imputed with knowledge of an admittedly clearly established right." *V–1 Oil Co. v. Wyoming Dept. of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990) (internal citations and quotation marks omitted).

The defendant officers here rely on both of the qualified immunity theories outlined above. First, they say the First Amendment rights of plaintiffs which the officers allegedly violated were not clearly established law at the time of the 1988 arrests. Second, they argue that they had been told of a legal ruling or advice which they relied on in good faith. We will consider both theories in turn, discussing first whether plaintiffs' rights were clearly established at the time of their arrests. Later we treat the theory of legal advice relied on as the "extraordinary circumstances" defense referred to in *Harlow* and analyzed by this court in *V–1 Oil*.

 Thus we turn first to the question whether the constitutional rights alleged to have been violated here were "clearly established."[2] "That determination is purely legal." *National Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 574 (D.C.Cir.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984). The First Amendment to the Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the

people peaceably to assemble." These rights have long been made applicable to the states by the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925) (speech); *DeJonge v. Oregon*, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937) (assembly). Public places, such as the sidewalk involved here, and streets and parks, historically associated with the free exercise of expressive activities, are considered without more to be "public forums"; in such places, the government's ability to permissibly restrict expressive conduct is very limited. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). *But cf. Brown v. Palmer*, 944 F.2d 732, 739 (10th Cir.1991) (en banc).

The record before us shows that the activity which the police found objectionable was not the picketing itself but the specific content of the protestors' signs which read "The Killing Place." The Stipulated Pretrial Order states clearly that "Plaintiffs were arrested because they displayed a sign with the words 'killing place' on it while they were on a public sidewalk fronting an abortion facility." I R. Doc. 5, at 2; *see also id.* Doc. 4, at 1; *id.* Doc. 8, Ex. D at 15–16 (Dep. of Baca). Officer Ryan–Fairchild specifically told the protestors, "You can cover 'The Killing Place' or you will be arrested." *Id.* Doc. 7, Ex. B at 30 (Dep. of Ryan–Fairchild).

 Thus the officers' actions here raise a serious question whether they violated the paramount principle that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); *see also Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980). "For the State to enforce a content-

2. It seems clear that the arrests were made under color of state law, although defendants construct a contrary argument out of the contention of plaintiffs that Ryan–Fairchild was off duty and not entitled to qualified immunity. Although she was off duty when she made the arrests, Ryan–Fairchild summoned Baca's assistance and arrested Cannon and Hill through her authority as a police officer. She therefore acted under color of state law. *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1430 (10th Cir.1984), *judgment vacated on other grounds*, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985).

based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Here the state interest in question is the avoidance of violence and breach of the peace which may be threatened by the use of provocative "fighting words." "It is clear that 'fighting words'—those that provoke immediate violence—are not protected by the First Amendment." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982). While the defendants assert a broader theory than mere reliance on the fighting words principle, in actuality their position necessarily depends on making a showing sufficient to establish the fighting words defense.[3]

The Supreme Court has addressed the subject of fighting words in several contexts. In *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the defendant was arrested for a breach of the peace in a predominantly Roman Catholic neighborhood after he played a record on the streets which denounced organized religion, and especially Catholicism, as the instrument of Satan. No crowd was drawn, but two of the hearers testified that they were close to violence. The Court reversed Cantwell's conviction on a count for commission of the common law offense of inciting a breach of the peace, stating:

Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace. One may, however, be guilty of the offense if he commits acts or makes statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, *the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.*

We find in the instant case no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion.

. . . .

Although the contents of the record not unnaturally aroused animosity, we think that, *in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.*

310 U.S. at 309–11, 60 S.Ct. at 905–06 (emphasis added).

Two years later in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the Court upheld the conviction of a defendant who had called a police officer to his face "a God damned racketeer"

---

**3.** On appeal the broader statement of the defendants' position is as follows:

The dispositive inquiry in this case is whether Officer Ryan–Fairchild merely arrested Plaintiffs for carrying the sign or whether in the totality of the circumstances there existed indications of potential violence which, when coupled with the judicial advice Officer Ryan–Fairchild received, would at least cause reasonably competent officers to believe probable cause existed to arrest for disturbance.

Answer Brief of Appellees at 12.

We feel that this broad statement of defendants' position is in conflict with the specific statements in the record below cited earlier. In particular we are convinced that the restated contention conflicts with the Stipulated Pretrial Order which stated: "Plaintiffs were arrested because they displayed a sign with the 'killing place' on it while they were on a public sidewalk fronting an abortion facility." I R. Doc. 5, at 2. We thus focus on the "fighting words" issue.

and a "damned Fascist." *Id.* at 569, 62 S.Ct. at 768. The court held this language to be "fighting words," stating there was no constitutional problem in punishing utterances, *inter alia,* of *"the insulting or fighting words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."* *Id.* at 572, 62 S.Ct. at 769 (emphasis added). The Court stated that "[i]t has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*

We also find that *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), is instructive. When confronted with an appeal from a conviction of a man who had entered a courthouse wearing a jacket which read "F--- the Draft," the Supreme Court reversed. It held that the words on the jacket did not constitute fighting words. Rather fighting words were *"those personally abusive epithets which, when addressed to the ordinary citizen, are as, a matter of common knowledge, inherently likely to provoke violent reaction."* *Id.* at 20, 91 S.Ct. at 1785 (emphasis added). The Court said that while the obscenity displayed in relation to the draft was not uncommonly "employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer.'" *Id.* (quoting *Cantwell,* 310 U.S. at 309, 60 S.Ct. at 905). The Court noted that "words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." *Id.* 403 U.S. at 26, 91 S.Ct. at 1788.

■ Here the defendants have argued that the signs aroused violent feelings in some persons who viewed them. The fact that speech arouses some people to anger is simply not enough to amount to fighting words in the constitutional sense. "[A] function of free speech under our system is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). It is only where "the speaker passes the bounds of argument or persuasion and undertakes incitement to riot" that the police may intervene to prevent a breach of the peace. *Feiner v. New York,* 340 U.S. 315, 321, 71 S.Ct. 303, 306, 95 L.Ed. 295 (1951). The Court in *Feiner* upheld a conviction of a man who addressed a crowd of 75 or 80 people, both blacks and whites, who "gave the impression that he was endeavoring to arouse the Negro against the white, urging that they rise up in arms and fight for equal rights." *Id.* at 317, 71 S.Ct. at 304.

■ Fighting words are thus epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas.[4] The placards which read "The Killing Place" were aimed at the activities which took place within the clinic. By extension this term no doubt swept in the staff and patients of the clinic as well, but not in the direct way contemplated by the Court's requirement that the words be "epithets" "directed at the person of the hearer." Similarly while it must be admitted that the signs were likely to offend those entering the clinic, their offensiveness was not inherently likely to cause an immediate breach of the peace. Finally, although the words "killing" or "murder" are certainly emotionally charged, it is difficult to conceive of a forceful presentation of the anti-abortion viewpoint which would not assert that abortion is the taking of human life.

We are convinced that here the message on the signs did not amount to fighting words

---

4. It has been stated that "[f]ighting words are not a means of exchanging views, rallying supporters or registering a protest; they are directed against individuals to provoke violence or inflict injury." *R.A.V. v. City of St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2553, 120 L.Ed.2d 305 (1992) (White, J., concurring).

under the Supreme Court's standards. They were not personally abusive epithets so directed that they were "inherently likely to provoke violent reaction." *Cohen,* 403 U.S. at 20, 91 S.Ct. at 1785. They did not approach the incitement to riot involved in *Feiner.* Furthermore they played an important role in the exposition of ideas. We hold therefore that the right of the protestors to picket on the public sidewalk in front of the clinic with the signs was a clearly established constitutional right at the time of the 1988 arrests in question.[5]

**B**

■ In further connection with their qualified immunity defense, the defendant officers also maintain that even if they violated clearly established rights of the protestors they are nevertheless immune under the "exceptional circumstances" defense described in *Harlow* because they relied on the legal opinion and statements of Judge Soja. Although in the officers' view this contention goes to the reasonableness of their actions in the totality of the circumstances, in determining whether the rights were "clearly established" legal advice given to the defendants is not dispositive. *Melton v. City of Oklahoma City,* 879 F.2d 706, 730–31 (10th Cir.1989), *vacated in part on other grounds,* 928 F.2d 920 (10th Cir.1991) (en banc); *V–1 Oil Co. v. Wyoming Dep't of Envtl. Quality,* 902 F.2d at 1488 n. 5 (10th Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). *Melton* "instructs us not to refer to legal advice the defendant received when we decide whether or not the governing law was clearly established; it gives no guidance in deciding when a defendant should not be expected to have known the governing law." *V–1 Oil,* 902 F.2d at 1488–89 n. 5. Instead,

the fact of legal advice goes to the question of whether there were "extraordinary circumstances" which prevented the officers from knowing that the rights which they violated were clearly established.

We have noted that a determination whether legal advice given to a defendant constitutes "extraordinary circumstances" depends upon the circumstances of each case. *Id.* at 1489. As its name suggests, the "extraordinary circumstances" exception to the rule that a qualified immunity defense fails where the defendant violated a clearly established right applies only rarely. *Id.* at 1488. The circumstances must be such that the defendant was so "prevented" from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right. *Id.*[6] And, proving such a defense is the burden of the defendant relying on it. *E.g., Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738; *V–1 Oil,* 902 F.2d at 1488.

In *V–1 Oil,* we considered relevant factors for determining when legal advice satisfied the "extraordinary circumstances" exception, including: "how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was"; "whether complete information had been provided to the advising attorney[s]"; "the prominence and competence of the attorney[s]"; and "how soon after the advice was received the disputed action was taken." *Id.* (footnote omitted). Applying these factors here, we conclude the record does not show that the defendants were entitled to summary judgment under the "extraordinary circumstances" exception.

The record shows that it was Officer Ryan–Fairchild who made the decision to

---

5. This conclusion is buttressed by the fact that at the time of the arrests, courts which had addressed the specific issue—whether "killing" and "murder" were proscribable words if used on a sign in a protest at an abortion clinic—found that they were not. *See O.B.G.Y.N. Ass'ns v. Birthright of Brooklyn & Queens, Inc.,* 64 A.D.2d 894, 407 N.Y.S.2d 903, 906 (N.Y.App.Div.1978) (holding that terms "murder" and "kill" are not fighting words and their use cannot be enjoined); *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918, 933 (1986), (noting that trial court had correctly refused to enjoin use of words "killed"

or "murdered" on picket signs at medical building), *cert. dismissed,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). Another decision after the arrests is in accord. *See Ohio v. Meyer,* 61 Ohio App.3d 673, 573 N.E.2d 1098, 1100 (Ohio Ct.App.1988) (hanging doctor in effigy with bloodied hands, who was said on sign to "kill babies," not fighting words).

6. Generally officials are held to have constructive knowledge of established law. *Salahuddin v. Coughlin,* 781 F.2d 24, 27 (2d Cir.1986).

arrest plaintiffs Hill and Cannon. The officer stated specifically: "I made the decision to arrest Mrs. Hill and Mrs. Cannon." I R. Doc. 7, Ex. B at 29. Officer Ryan–Fairchild explained that she was informed of "Judge Soja's ruling" about disturbances when she contacted Detective Yates approximately a week before the arrests; she said Yates repeated the context of "Judge Soja's comments," which was that words tending to incite any person would be fighting words.[7]

Officer Baca, in turn, received his information about the law from Ryan–Fairchild. Baca testified that the wording on the sign did not seem to him to be a violation of the law until Ryan–Fairchild told him that it was. *Id.* Doc. 8, Ex. D at 18. Baca then followed Officer Ryan–Fairchild's decision to arrest Hill and Cannon.

Ryan–Fairchild told Baca that Officer Yates had told her that Judge Soja had said that a sign with "The Killing Place" on it would be a violation of the disturbance of the peace statute. *Id.* at 15. While Judge Soja's deposition testimony does not necessarily contradict Ryan–Fairchild's version, we think that viewed in the light most favorable to the plaintiffs it indicates that he gave legal advice in far more general terms.[8]

7. In her deposition, Officer Ryan–Fairchild gave the following testimony:

Q. How did you arrive at any knowledge about Judge Soja's ruling about disturbance?
A. I contacted Detective Yates about a week before this occurred on another matter, and she asked if I had heard about what Judge Soja had said about disturbances at Planned Parenthood, and I said, "No," so she kind of filled me in on what Judge Soja considered to be fighting words or a disturbance.
Q. And what was the context—as you understood it, what was the context of Judge Soja's comments?
A. That any words that would tend to incite or provoke any person would be fighting words. In other words, saying baby killer, murderer, killing in any regard.
Q. And that—what I'm trying to get at with my question—and I guess it wasn't clear—what was the context in which Judge Soja was sitting or was contacted in which you understood him to have made that pronouncement?
A. I don't know.
Q. Was it a court case?
A. All I know is that Detective Yates told me that Judge Soja had made a ruling about disturbances at the clinic, and this is what his ruling was.
Q. Did you do any independent investigation as to what the nature of that ruling was?
A. No.
Q. Did you ever see anything in writing, any order from the court or ruling or anything in writing that would indicate to you what Judge Soja's order was about?
A. No, sir.
Q. Did you investigate that?
A. No, sir.
Q. Why not?
A. I felt that Detective Yates was giving me valid information.
Q. Can you repeat again, now, exactly what it was you understood to be a disturbance of the peace as Judge Soja is alleged to have said it in some context we don't understand?

A. That any words such as killing, baby killer, baby murderer, murderer, anything along those lines constitute a disturbance if they disturb the peace of the parties that are in the clinic.
I R. Doc. 7, Ex. B at 7–9.

8. Denver County Court Judge Theodore Soja testified by deposition. Portions of it are attached to the briefs filed below by the parties. I R. Doc. 7, Ex. F; *id.* Doc. 8, Ex. A.

The judge there tells about Officer Yates coming to him and requesting advice about the situation at the abortion clinic. He said, "As I recall, this was in generalities." *Id.* at 5. Officer Yates wanted to know how they should approach cases where people are protesting legitimately. Officer Yates was asking her questions in the context of her duties as a police officer.

The judge said that he "vaguely" remembered a case that had been dismissed where the issue had been the holding of a sign that said, "The Killing Place," and circumstances surrounding the incident. The judge did not understand that the previous case concerning that sign was related to Officer Yates' conversation with the judge. *Id.* at 6. The judge added that, "All I know is that [Officer Yates] came in to discuss certain things with me so that she herself, in whatever capacity she was, that she could carry out her functions as a police officer in good faith without infringing on anyone's rights." *Id.* at 7.

The judge described his response to her as follows:
I explained to her that she would have to watch and take into consideration the totality of all circumstances.

Each particular case would be different, and that she would have to determine and make a judgment call on whether these people that are protesting, whether they're violating any law. If they're violating a law, then she can exercise her duties as a police officer to carry out her functions.

We discussed then as to the fact, and she understood it, and she brought it up that she knows that they have a Constitutional right to

We cannot on this record hold as a matter of law that Officers Ryan–Fairchild and Baca were so prevented from knowing that they were violating the protestors' clearly established rights as to be entitled to a qualified immunity defense. Under the undisputed evidence, the defendants have made a substantial, but not an overwhelming, showing on the *V–1 Oil* factors. In the defendants' favor, there seems to be little doubt that the legal advice was given by a government officer of considerable prominence, a county judge. On the other hand, unlike *V–1 Oil*, the judge's advice was not required to be acted on immediately. Moreover, the proofs offered on summary judgment do not necessarily show that Judge Soja's advice was unequivocal or that it was specifically tailored to the particular facts at issue. .

In sum, we hold that the summary judgment for the defendant officers cannot be upheld on the basis of the "extraordinary circumstances" exception. It is true that as a general rule qualified immunity is a "legal, not a factual, issue which must be resolved in the first instance by the trial court." *Snell v. Tunnell,* 920 F.2d 673, 696 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). Nevertheless, when a defendant relies on the "extraordinary circumstances" exception the issue may raise questions of fact. *See Lutz v. Weld County School Dist. No. 6,* 784 F.2d 340, 343 (10th Cir.1986) (per curiam) ("Defendants were . . . entitled to an instruction on their qualified immunity defense only by raising a fact issue as to whether there were exceptional circumstances such that a reasonable person in their positions would not have known of the relevant legal standard"); *National Black Police Ass'n, Inc. v. Velde,* 712 F.2d 569, 574 (D.C.Cir.1983) (noting that while issue of

clearly established rights is question of law, defendant may still obtain qualified immunity in subsequent proceedings under "extraordinary circumstances" exception), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Czurlanis v. Albanese,* 721 F.2d 98, 108 n. 8 (3d Cir.1983) (observing qualified immunity is question of law "unless defendants have claimed extraordinary circumstances"). *Harlow* itself noted that where a defendant claims "extraordinary circumstances," it is his or her burden to "prove that he neither knew nor should have known of the relevant standard." 457 U.S. at 819, 102 S.Ct. at 2738.

The defendants' claim of immunity under the "extraordinary circumstances" exception on this record presents a genuine question of material fact, *see Lutz,* 784 F.2d at 343, and the defendant officers are not entitled to summary judgment on the basis of qualified immunity.

C

The protestors also seek declaratory and injunctive relief against the officers. Unlike the claim for money damages, there is no qualified immunity to shield the defendants from claims for these types of relief. *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 527 (9th Cir.1989). As we have discussed above, the plaintiffs have made a strong showing that the officers, acting under color of state law, deprived the protestors of their clearly established constitutional rights. The summary judgment dismissing the constitutional claim is being reversed and on remand the district judge should reconsider the prayer for declaratory and equitable relief with respect to the officers.

protest. What she wanted to know is under what circumstances have they gone beyond the law in protesting, depriving someone else of their rights, or causing a possibility of anger, antagonism, hostility or by certain fighting words that would possibly, if they're addressed to the person individually, that those particular fighting words could incite an individual to violate the law, to become angry or hostile as a result of those particular words that are being used.

 That is taken in the context of the totality of all the circumstances. When you do that you

take into consideration the conduct, facial expression, body movements, all these things into consideration. And the officer only knows the circumstances at that time, and then it's a judgment call. It must be done in good faith. *Id.* at 7–8.

 The judge was asked if he was speaking in a judicial capacity making a ruling when he was talking to Officer Yates. He explained that he was not making a ruling. He was attempting to answer her question so that she could carry out her functions as a police officer in a legal manner. *Id.* at 24.

## III

### A

The plaintiffs also contend that the district judge erred in holding there was no basis for liability of the City and County of Denver and in granting summary judgment for them. They challenge the ruling that the claim against the municipality must be rejected for lack of any showing, sufficient to· avoid summary judgment, that there was a custom or policy of arresting abortion protestors "who engage in this type of conduct." Order of Dismissal at 12.[9]

The touchstone of a § 1983 action against a governmental body is an allegation that official policy is responsible for deprivation of rights protected by the Constitution. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Municipal liability may not be premised on employment of a tortfeasor with liability imposed under a *respondeat superior* theory. *Id.* at 691, 98 S.Ct. at 2036. Municipalities can be held liable only when an injury was inflicted by execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Id.* at 694, 98 S.Ct. at 2037; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22, 108 S.Ct. 915, 922–23, 99 L.Ed.2d 107 (1988) (plurality opinion) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037). The plaintiffs maintain here that they have made a case for municipal liability; that although there may not be an express municipal or departmental policy of harassing anti-abortion protestors, the evidence shows a widespread practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* 436 U.S. at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)).

In addition to the specific arrest challenged here, Cannon and Hill have introduced significant further evidence tending to show police harassment of anti-abortion protestors. Hill testified that when she returned to the protest site during the week ·after her arrest, Officer Ryan–Fairchild threatened to arrest her and confiscate her camera film if she took Ryan–Fairchild's picture. I R. Doc. 8, Ex. H at 2 (Aff. of Hill). On February 20, 1988, Bishop James Mote was cited by Detective Carol Yates for "disturbing the peace" because he was carrying a sign which read: "The Killing Place." *Id.* Ex. I (Sullivan statement).

Evidence was also introduced that during a later protest on October 28, 1989, a Denver Police officer shoved an abortion protestor, Terry Sullivan, to the ground and tore up, or confiscated, several of his signs. In his statement dated November 1, 1989, verified in his affidavit, Sullivan said that the October 28, 1989, incident was one of a series of police actions at the 20th and Vine location "over the past two years." On November 4, 1989, Sgt. Brooks was again the hired officer of the day and he confiscated the sign that Sullivan had attached to a baby carriage and also confiscated a second sign on the carriage. Another sign was confiscated by Sgt. Brooks when its owner leaned it against a tree, the contents of her sign being "Let's Talk," an invitation for women entering the abortion clinic to discuss what was happening. Sullivan said that the arrest of Cannon and Hill for carrying the signs with "The Killing Place" wording was "an instance of a continuing pattern of abuse of police authority by uniformed officers working off-duty for Planned Parenthood...." Sullivan said the last incident involving his sign took place in the presence of six on-duty police officers who had arrived after the police were called as a protest against an earlier episode of sign destruction. *Id.* Ex. I (Aff. of Sullivan). Sullivan stated in a complaint to the Denver Police Department that on another occasion he was arrested and jailed on a trespassing charge for a weekend without bail for having distributed anti-abortion leaflets. *Id.* (Internal Investigations & Inspection Bureau Statement).

9. Unlike the individual police officers, the governmental entities may not assert qualified immunity from the suit for damages. *Owen v. City of Independence*, 445 U.S. 622, 654–55, 100 S.Ct. 1398, 1417, 63 L.Ed.2d 673 (1980) (rationales for doctrine of official immunity do not apply where municipal liability is at issue); *Watson v. City of Kansas City*, 857 F.2d 690, 697 (10th Cir.1988).

Ray Williams stated in a November 22, 1989, affidavit that recently a Denver police officer had ejected him from a public meeting because of his having carried a sign outside the meeting saying "Stop Abortion." *Id.* Ex. J at 2 (Aff. of Williams). Sullivan also described an incident when the police took no action against a physician working at the clinic who hit a protestor with his car. *Id.* Ex. I.

Although these incidents do not conclusively prove the existence of a general municipal practice of First Amendment violations against antiabortion protestors, when seen in the light most favorable to the plaintiffs we agree that they are evidence from which the trier of fact could reasonably infer the existence of such a policy. The evidence submitted by plaintiffs would support an inference of considerably more than one instance of conduct, which alone may not prove a custom or policy. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion). Here when all of the plaintiffs' evidence is considered, it is sufficient, if believed, to support a finding that the City and the Police Department followed a policy or custom resulting in violation of plaintiffs' constitutional rights; hence the grant of summary judgment for the municipal defendants was error. *Watson v. City of Kansas City,* 857 F.2d 690, 696 (10th Cir.1988) (showing by police arrest statistics and other evidence sufficient, as to alleged unconstitutional municipal policy or custom, to avoid summary judgment); *see also Bordanaro v. McLeod,* 871 F.2d 1151, 1155–58 (1st Cir.) (evidence of long-standing, widespread practice of police breaking down doors without a warrant when arresting a felon sufficient to support jury findings for plaintiffs of existence of unconstitutional custom, attribution of it to the municipality, and its causal link to plaintiffs' injuries on § 1983 claim), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989).

Accordingly, the summary judgment dismissing the plaintiffs' § 1983 claims against the municipal defendants must be reversed.

## B

Cannon and Hill make a further argument that under *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), they need not show that an actual unconstitutional policy exists. Instead they say they can establish liability of the municipality if they can show that the constitutional wrong was the result of the municipality's failure to train the officers. The defendant City and County of Denver contends that this claim was not asserted below and cannot be entertained on appeal. We agree.

After careful review of the record, we find that there were no allegations made below which can be fairly read to notify the court and the defendants that plaintiffs were presenting a failure to train claim. The order of dismissal of the district judge contains no reference to such a claim. We will therefore follow our general rule not to address "issues that were not considered and ruled upon by the district court." *Burnette v. Dresser Industries,* 849 F.2d 1277, 1282 (10th Cir.1988).

In this connection, Cannon and Hill's complaint in the instant case alleges only that "the acts of the Defendants were undertaken in furtherance of a custom or policy of the Defendant CITY or the Defendant POLICE DEPARTMENT." I R. Doc. 1, at 4–5 (emphasis in original). This allegation does not fairly indicate a failure to train claim because arrests do not *ipso facto* show a failure to train. Similarly, the sentence in the plaintiffs' brief below, cited in Defendants' Reply Brief on Appeal at 19 n. 9, decrying the policy of allowing abortion clinics to hire off-duty police "absent the imposition of safeguards to ensure neutrality" is simply too vague to raise the issue of training. I R. Doc. 8, at 28.[10] We feel that none of the

10. The strained argument of plaintiffs in the Reply Brief of Appellants at 19, and its notes 9 and 10, is not persuasive to show that a failure to train claim was asserted properly below. Citing questions posed to Officers Ryan–Fairchild and Baca, plaintiffs there contend that they are not foreclosed on this appeal from reliance on the failure to train rationale. We disagree. Interrogating the defendant officers on their training and alleged deficiencies in training does not serve as proper notice to the trial court and the defendants that plaintiffs have decided to assert, and were actually asserting, a claim of lack of training as a basis for recovery. The questioning

references below was sufficient to have made a fair presentation of the training issue to the district court or to the defendants. Hence, we do not reach this issue or consider its merits on this appeal.[11] *Woods v. City of Michigan City*, 940 F.2d 275, 279–80 (7th Cir.1991).

The protestors also moved to amend the pleadings and to alter or amend the judgment. They say that denial of the motion was error. Denial of the motion to amend the pleadings after final judgment had been entered was not an abuse of discretion. *See Cooper v. Shumway*, 780 F.2d 27, 29 (10th Cir.1985). Therefore there is no merit to the claim of error in denying leave to amend. This ruling is, however, without prejudice to a further motion to amend on remand. The district judge may consider such a motion on remand of the case. The claim of error in not altering or amending the judgment need not be separately treated in light of our reversal of the summary judgment for the defendants.

The plaintiffs further claim error in the dismissal of the pendent state law claims. In light of our reversal of the summary judgment on plaintiff's federal claims, we also reverse the dismissal of the pendent state law claims. On remand, the district judge will thus be able to reconsider whether those state law claims should be entertained by the federal court.

## IV

Accordingly, the summary judgment dismissing the plaintiffs' federal claims against the defendant Officers and the City and County of Denver and its Police Department is **REVERSED.** The dismissal of plaintiffs' pendent state law claims without prejudice is **REVERSED.** The cause is **REMANDED** for further proceedings in accord with this opinion.

STEPHEN H. ANDERSON, Circuit Judge, separately concurring.

I concur in the persuasive and thorough majority opinion in this case, but do so reluctantly with regard to Part III A of the opinion and the disposition therein. I write separately to express my concern about the plaintiffs' submission intended to show that a genuine issue of fact exists regarding the existence of an alleged municipal custom or policy of arresting certain abortion protestors.

Municipal liability may indeed be premised upon "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)). That question is, of course, factual and, in this case, is disputed, which suggests that the district court erred in granting summary judgment on the matter.

However, the plaintiffs' evidence as to the existence of such a widespread practice is extremely thin. It consists of fewer than a dozen incidents over a two-year period, all involving plaintiffs in this case, and with no larger context in which to evaluate the inci-

alone did not give fair notice of such a claim or amount to proper amendment of the plaintiffs' claims to include that theory.

11. We note that as "new material," the proposed First Amended Complaint included the following paragraph which did refer to "training techniques":

8. *That this court issue an injunction ordering the Denver Police Department to adopt clear polices* [sic]*, guidelines, and training techniques so that its officers know and can apply laws in light of First Amendment guaranties* [sic] *of free speech, fee* [sic] *assembly, and free expression. Further, that uniformed officers, working off-duty, be barred from working for abortion providers such as Rocky Mountain Planned Parent-hood, unless they have obtained special training in Constitutional liberties. And further, that uniformed officers be restrained from falsely arresting, threatening with arrest, or harassing those who protest abortion as a class.*

I R. Doc. 11, at 16 (emphasis in original to show "new material").

As discussed in text, the motion to amend was untimely, being filed after entry of judgment below. We cite the above paragraph as the only reference we can find in this record which would fairly indicate a claim of lack of training. We note it is underscored as "new material," and hence it cannot serve as a timely averment of a lack of training claim below.

dents (i.e. how many anti-abortion protests occurred in the two-year period; how many, if any, occurred without similar incidents; how many protesters were there; what percentage was arrested; how many officers effected arrests and how many did not; what evidence exists other than the few arrests in question over a two-year period to show that knowledge on the part of responsible officials must be inferred; and so on). This falls short of the kind of evidence developed in *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir.1988) (statistical evidence and evidence regarding the training given officers) and *Bordanaro v. McLeod*, 871 F.2d 1151, 1155–58 (1st Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989).

Frankly, in my view if the plaintiffs' evidence at the end of a trial remained as it now stands, the trial judge would be entitled to grant a defense motion under Fed.R.Civ.P. 50 for judgment as a matter of law. Thus, technically, the record before us now could support the grant of summary judgment to the defendant City, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (summary judgment for defendant appropriate unless there is "evidence on which the jury could reasonably find for the plaintiff"). However, giving the plaintiffs the benefit of the doubt and recognizing the highly factual nature of the issue, I reluctantly concur.