99 F.3d 1009
 65 USLW 2383
 Colleen K. WILLIAMS, Individually and as Personal
Representative of the Estate of Randy M. Bartel,
Plaintiff-Appellant,
v.
DENVER, CITY AND COUNTY OF; Michael W. Farr, Individually
and in His Capacity as an Officer of the Denver Police
Department; Aristedes Zavaras, Individually and in His
Official Capacity as Chief, Denver Police Department;
Manuel Martinez, Individually and in His Official Capacity
as Manager of Safety for the City and County of Denver;
Roger Cisneros; Edward Sullivan; Leslie Franklin; Jane
Woodhouse; Deborah Wagner, Individually and in Their
Official Capacities as Members of the Civil Service
Division, City and County of Denver, Defendants-Appellees.
 No. 94-1190.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 6, 1996.
Rehearing En Banc Granted and Opinion Vacated March 3, 1997.
 
 Timothy M. Rastello (Steven E. Christoffersen and Steven W. Black, with him on the brief), Denver, CO, for Plaintiff-Appellant.
 Theodore S. Halaby (Robert M. Liechty, with him on the brief), of Halaby Cross Liechty Schluter & Buck, Denver, CO, for Defendants-Appellees.
 Before SEYMOUR, Chief Judge, ANDERSON, Circuit Judge and SHADUR, Senior District Judge.*
 SEYMOUR, Chief Judge.
 
 
 1
 We are once again called upon to address the tragic aftermath of a high-speed collision caused by a police vehicle. The district court granted summary judgment for all defendants. We affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 In reviewing a grant of summary judgment, we view the record in the light most favorable to the party against whom the judgment is granted. Cannon v. City & County of Denver, 998 F.2d 867, 870 (10th Cir.1993). Viewed in this light, the record reveals the following facts. The fatal collision occurred at approximately 4:00 a.m. Sunday morning, June 4, 1989. Officer Farr was responding to a request by another officer to back up the arrest of a car thief. Significantly, the requesting officer did not ask for an emergency response nor indicate that he was in danger. Officer Farr responded by driving down a major Denver boulevard at 60 m.p.h. in a 35 m.p.h. zone. Officer Farr activated his overhead lights but did not turn on his siren. The accident occurred when Officer Farr ran a red light without slowing down and broad-sided Randy Bartel's vehicle, which was proceeding into the intersection on the green light at no more than 20 miles per hour. Mr. Bartel died from his injuries.
 
 
 3
 At the time Officer Farr applied for a position with the Denver Police Department, he had a very poor driving record. His license had been revoked three times, and he had been convicted of numerous traffic violations, including four convictions for speeding. Other law enforcement agencies had previously denied him employment at least four times. The executive director of the Denver Civil Service Commission strongly recommended that Officer Farr not be hired because of his driving record and felt that "he was an accident waiting to happen." Aplt.App., vol. IV, at 1028. The director attached a handwritten note to Officer Farr's file which stated: "Do not waste time on this one. Three suspensions. Flunks because of driving record." Id. vol. I, at 167. The psychological report requested by the City[1] with respect to Officer Farr's application stated that he "may show a serious behavioral or emotional adjustment disorder" and "strongly recommended that follow-up testing and interviewing be conducted in order to determine the significance and range of these difficulties." Id. vol. III, at 747. The report noted that Officer Farr showed "a significant history and/or pattern of motor vehicle infractions and driving difficulties. These are likely to include moving violations, automobile accidents, and, in some cases, driving while under the influence of drugs or alcohol." Id. vol. I, at 233. Despite this report and another psychologist's recommendation that the City investigate Officer Farr further, it did not conduct additional testing or inquiry before hiring him.
 
 
 4
 The City did not give Officer Farr any special or remedial driving training after hiring him, and he had nine incidents of unacceptable driving during the training he did receive.[2] Prior to the collision at issue here, Officer Farr was involved in another accident in which he hit a car while making a U-turn into oncoming traffic without using his emergency lights or siren. Officer Farr was found at fault and received a written reprimand. Although he was ordered to attend remedial driving training, he did not do so.
 
 
 5
 State law and the Department's written procedures both require emergency vehicles to use their lights and sirens and to slow down before entering controlled intersections if they are otherwise violating traffic laws. The record contains evidence that Denver police officers commonly respond to emergency calls without activating their sirens or reducing their speed at red lights or stop signs, and that the City has not taken steps to enforce compliance with the safety provisions. See, e.g., Aplt.App., vol. IV, at 1074-76, vol. III, at 937-45, vol. I, at 203, 207, 227-28.
 
 
 6
 Colleen Williams brought this action under 42 U.S.C. § 1983 individually and as the personal representative of Randy Bartel, her son. Ms. Williams sued Officer Michael Farr, the Denver Police Department and its Chief of Police, the Denver Manager of Safety, the Denver Civil Service Division and its members, and others. She alleged that the manner in which Officer Farr operated his police vehicle and the City's deliberate indifference to the need to train, supervise, and/or discipline violated her son's constitutional rights. She also alleged that the City was liable on the basis of its decision to hire Officer Farr. Finally, Ms. Williams alleged that defendants interfered with her constitutionally protected relationship with her son.
 
 
 7
 The district court granted summary judgment for defendants on all claims. The court ruled that Ms. Williams' claim for the deprivation of her right to familial association was precluded by Trujillo v. Board of County Comm'rs, 768 F.2d 1186 (10th Cir.1985), in which we held this claim requires an allegation that the defendant intended to interfere with the particular protected relationship. The district court also held that Officer Farr and the other officials sued individually were entitled to qualified immunity because the law governing the claims against them was not clearly established at the time of the collision. The court then ruled as a matter of law that Officer Farr's conduct was not unconstitutional and that the claim against the City based on its failure to train or supervise must therefore fail. Finally, the court rejected Ms. Williams' argument that the City could be held constitutionally liable for its own conduct absent a showing that Officer Farr's actions amounted to a constitutional violation.
 
 
 8
 On appeal, Ms. Williams contends the district court erred in holding that the law was not clearly established with respect to her claim against defendants individually. She further argues that the court erred in holding for the City, asserting that a factual dispute exists over whether Officer Farr's conduct was unconstitutional and whether the City was deliberately indifferent to its need to train, supervise, and/or discipline. Ms. Williams also contends the court erred in holding the City could not be liable absent a constitutional violation by Officer Farr. Finally, she urges us to abandon the intent requirement Trujillo imposes on claims asserting deprivation of the right to familial association.
 
 II.
 
 9
 Ms. Williams' claims against the City are based both upon its alleged deliberate indifference to its need to institute training, supervision and discipline procedures on emergency driving, and upon its own conduct in hiring and training Officer Farr. The district court concluded as a matter of law that Officer Farr's conduct was not unconstitutional and that the City's policies and procedures therefore could not support municipal liability based on Officer Farr's conduct. The court also rejected Ms. Williams' assertion that the City could be held liable on the basis of its own conduct absent a constitutional violation by Officer Farr. We disagree with both conclusions. We conclude that the evidence, viewed in the light most favorable to Ms. Williams, would support the conclusion that Officer Farr's conduct was unconstitutional and that the City might be held liable for that conduct. We also hold, in light of governing Supreme Court authority, that the City may be held liable for its own conduct even absent unconstitutional conduct by Officer Farr. In the latter instance, however, we are not persuaded the evidence is sufficient under the proper standard to send the issue of the City's direct liability to the jury.
 
 
 10
 The Supreme Court has addressed theories of municipal liability in a pair of cases. See Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Collins makes clear that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." 503 U.S. at 120, 112 S.Ct. at 1066. The Court "emphasize[d] the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred." Id. at 122, 112 S.Ct. at 1067.
 
 
 11
 In City of Canton, the Court assumed that city employees denied the plaintiff's constitutional rights, see 489 U.S. at 388 n. 8, 109 S.Ct. at 1204 n. 8, and then analyzed whether the city was responsible for that injury. The Court held that a city can be held responsible for the constitutional tort of its employee "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." City of Canton, 489 U.S. at 388, 109 S.Ct. at 1204. The term "deliberate indifference" employed in City of Canton was thus used not to ascertain the existence of a constitutional violation, but "for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents." Collins, 503 U.S. at 124, 112 S.Ct. at 1068 (describing "deliberate indifference" as used in City of Canton ).
 
 
 12
 In Collins, on the other hand, the Court assumed that the city was responsible for the injury and asked instead whether the harm rose to a constitutional violation. Id. In so doing, the Court assessed whether the city's failure to train its employees was itself an unconstitutional deprivation of substantive due process because the city's own conduct could "properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. at 128, 112 S.Ct. at 1070. Ms. Williams contends the City is liable for the alleged violation of her son's constitutional rights under both theories.
 
 A.
 Officer Farr's Conduct
 
 13
 We turn first to Officer Farr's conduct.[3] In Medina v. City & County of Denver, 960 F.2d 1493, 1496-97 (10th Cir.1992), we concluded that a police officer could be held responsible under section 1983 for harm caused by a third person if the officer acted in reckless disregard of the rights of a limited group as opposed to the public at large. See also Webber v. Mefford, 43 F.3d 1340, 1343 (10th Cir.1994) (relying on Medina ). We nonetheless concluded that the law predicating liability on such reckless disregard towards a limited group and on the acts of third persons was not clearly established when the events at issue in Medina took place. We accordingly concluded that the individual defendants were entitled to qualified immunity on that basis. Id. at 1498-99.
 
 
 14
 We subsequently examined the elements of a substantive due process claim in light of Medina and Collins. See Uhlrig v. Harder, 64 F.3d 567 (10th Cir.1995), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996). In Uhlrig, we held that a plaintiff asserting such a claim must show that the challenged conduct was reckless as defined by Medina,[4] and must further show that "such conduct, when viewed in total, is conscience shocking." Id. at 574 (citing Collins, 503 U.S. at 126-30, 112 S.Ct. at 1069-71; Medina, 960 F.2d at 1496).
 
 
 15
 [T]o satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct. We do know, however, that the "shock the conscience" standard requires a high level of outrageousness.
 
 
 16
 Id. We recently applied Uhlrig in Liebson v. New Mexico Corrections Dep't, 73 F.3d 274 (10th Cir.1996), to require that a plaintiff asserting a substantive due process violation must assert " 'conduct that was so egregious, outrageous and fraught with unreasonable risk as to shock the conscience.' " Id. at 276 (quoting Uhlrig, 64 F.3d at 576).
 
 
 17
 We recognize that Medina contains language which could well be read to hold that a substantive due process violation may be predicated on conduct that is only reckless, as opposed to conscience-shocking. Medina was decided virtually simultaneously with Collins and did not discuss the holding in Collins under which deliberate indifference must be conscience-shocking to state a denial of substantive due process. As we have subsequently made clear in Uhlrig and Liebson, however, under Collins a substantive due process violation requires (1) that the defendant act with reckless intent, and (2) that the defendant's conduct shock the conscience.
 
 
 18
 We must now assess the evidence Ms. Williams offered in light of this standard. Ms. Williams presented evidence that Officer Farr was driving at least 60 m.p.h. in a 35 m.p.h. zone on a main metropolitan thoroughfare at night without his emergency siren. The backup request to which Officer Farr was responding was not designated an emergency, nor did the requesting officer indicate he was in danger. The collision occurred when Officer Farr ran a red light without reducing his speed. Under Colorado law,
 
 
 19
 [t]he driver of an authorized emergency vehicle, when responding to an emergency call ... may ... [p]roceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation; [and may] [e]xceed the lawful speeds ... so long as said driver does not endanger life or property. ...
 
 
 20
 Colo.Rev.Stat. § 42-4-108(2) (1995 Supp.) (emphasis added).[5] Significantly, the driver of an emergency vehicle is authorized to undertake the above-described conduct only when responding to an emergency call, id. § 42-4-108(2), and even then only when the vehicle is using its emergency lights and siren, id. § 42-4-108(3). Under the Denver Police Department Operations Manual in effect at the time, a driver responding to an emergency was similarly required to use the vehicle's flashing lights and siren, and when approaching a red light to reduce speed, yield if necessary to the right-of-way, and enter the intersection only when it is safe to do so. Aplt.App., vol. II, at 515-16.
 
 
 21
 In holding as a matter of law that Officer Farr's conduct was not unconstitutional, the district court compared the instant facts with those at issue in Apodaca v. Rio Arriba County Sheriff's Dep't, 905 F.2d 1445, 1446-47 & n. 3 (10th Cir.1990), in which we concluded that the conduct did not rise to a constitutional level. Although comparison with other cases may be helpful, the existence of unconstitutional conduct requires a court to assess the totality of the circumstances in a particular case to ascertain whether a plaintiff has set out a claim. Apodaca presented distinguishable circumstances.
 
 
 22
 In Apodaca, the fatal collision occurred when a deputy sheriff responded to a silent burglar alarm by speeding around a blind curve at 55-65 m.p.h. in a 35 m.p.h. zone after midnight when it had been raining and sleeting. The officer, who was not using his siren or flashing lights, rounded the curve and struck the decedent's car broadside as she was making a left turn out of a restaurant parking lot. Id. at 1446. We held the allegations that the officer was driving too fast for road and visibility conditions to be grounded in negligence. Id. at 1446-47 & n. 3. Apodaca should not be interpreted as holding that every law enforcement officer who drives too fast for the road and the weather without his flashing lights and siren is merely negligent. The presence of additional or distinguishing factors can clearly elevate such conduct from merely negligent to unconstitutionally reckless and conscience-shocking.
 
 
 23
 Apodaca is distinguishable in significant respects. First, although the officer in Apodaca was speeding, he had the right-of-way when he collided with the decedent turning left out of a parking lot. Here, to the contrary, Officer Farr sped into the intersection against the light without reducing his speed and without the warning sound of his siren. An officer who speeds through a red light without his or her siren decidedly disregards a much more obvious risk of serious harm than does a speeding officer who has the right-of-way.[6] Moreover, here Officer Farr was driving in violation of both state law and Department requirements governing emergency driving. While certainly not dispositive of the constitutional issue, this fact is relevant to whether his conduct could be characterized as conscience-shocking. Second, the officer in Apodaca was responding to a burglary in progress, whereas Officer Farr had been requested on a non-emergency basis to back up the arrest of a suspected car thief who was hiding in the car in a parking lot.[7] Third, the record of Officer Farr's prior driving history supports the inference that he was a scofflaw who deliberately operated his vehicle in a manner that imperiled the lives of those in his path. No such evidence appears in Apodaca.
 
 
 24
 The dissent asserts that the facts here are no more egregious than those in the cases it cites in which the conduct at issue was determined to fall short of a constitutional violation. We disagree. The dissent has focused only on the manner in which the police vehicle was being operated. In assessing whether the official conduct at issue is arbitrary or conscience-shocking in a constitutional sense, however, the risk of harm must be weighed against the justification for creating that risk. Conduct that is justified and therefore not arbitrary in one circumstance may be so unjustified as to be unconstitutional under different circumstances.
 
 
 25
 In the cases cited by the dissent, the reasons justifying the official conduct that caused the harm were of greater importance than in the instant case. For example, in Fagan v. City of Vineland, 22 F.3d 1296 (3d Cir.1994) (en banc), the court held the police officer was justified in pursuing a car that posed a substantial risk of harm to the community. The car was being operated at a high speed without its lights, running stop signs, and swerving at another police vehicle. In Temkin v. Frederick County Comm'rs, 945 F.2d 716 (4th Cir.1991), the police officer chased a car using his lights and siren after the officer observed the car spin its wheels out of a gas station and learned over the police radio that a theft had occurred. In Roach v. City of Fredericktown, 882 F.2d 294 (8th Cir.1989), the officer chased a car seen leaving the scene of several recent break-ins after learning that the license plates on the car had been issued to a different vehicle. The car had refused to stop and had fled. In Jones v. Sherrill, 827 F.2d 1102 (6th Cir.1987), the police pursued a car that they observed being operated in an unsafe manner and which they learned had just been involved in an accident. The court there observed that the chase was undertaken to protect the public from an obviously unsafe driver. In Cannon v. Taylor, 782 F.2d 947 (11th Cir.1986), the police officer hit another vehicle while responding to a disturbance at a pool hall. The officer was going about fifteen miles over the speed limit because he was concerned for the safety of the first officer who arrived at the scene of the disturbance. In none of these cases did the operation of the vehicle pose a greater risk of harm than in the instant case; in all of them the operation was justified by a greater police concern than the slight justification present here.
 
 
 26
 In every decision concerning a person's state of mind, inferences must be drawn from objective facts. Unlike the cases cited in the dissent, the objective facts here support a reasonable inference that this is not merely a case in which a police officer has carelessly or recklessly put the public at risk by speeding in the performance of his duties. Rather, the evidence here of Officer Farr's response to the non-emergency situation he was dealing with, coupled with the extensive record of his extraordinarily disturbing background, supports an inference that Officer Farr was speeding for speeding's sake, deliberately engaging in unjustified conduct that posed a great risk of harm to those in his path.[8]
 
 
 27
 In sum, we conclude that Officer Farr's alleged conduct, particularly his decision to speed against a red light through an intersection on a major boulevard in Denver without slowing down or activating his siren in non-emergency circumstances, all in violation of state law and police regulations, could be viewed as reckless and conscience-shocking. Accordingly, we hold the district court erred in ruling on a summary judgment motion that Officer Farr did not act unconstitutionally.
 
 B.
 
 28
 City's Failure to Train under City of Canton
 
 
 29
 We now turn to the effect our holding has on the lower court's disposition of Ms. Williams' claims against the City. First, Ms. Williams asserts that the City is liable for Officer Farr's unconstitutional conduct because its inadequate policy with respect to police training, supervision, and discipline amounted "to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388, 109 S.Ct. at 1204.
 
 
 30
 The grant of qualified immunity to the employee who allegedly violated the law may or may not be dispositive of a claim against the city based on deliberate indifference. See Hinton v. City of Elwood, 997 F.2d 774, 782-83 (10th Cir.1993). The employee is entitled to qualified immunity either if the law was not clearly established or if his conduct did not violate the law. When a finding of qualified immunity is predicated upon a determination that the law was not clearly established, the suit against the city can proceed. See id.; see also Medina, 960 F.2d at 1499-1500. A city may not be held liable under this theory, however, when there has been no underlying constitutional violation by one of its employees. Hinton, 997 F.2d at 782.
 
 
 31
 In this case the district court held, and we agree, that the individual defendants, including Officer Farr, were entitled to qualified immunity because the law was not clearly established when the challenged conduct took place. See Part III infra. In addressing municipal liability, however, the district court further held that Officer Farr's conduct was not unconstitutional and granted the City's motion for summary judgment on that basis. Accordingly, the court did not address Ms. Williams' "allegations concerning the City's improper policies or customs." Aplt.App., vol. IV, at 1133. We have now held, contrary to the district court, that Ms. Williams' evidence, viewed in her favor, supports a conclusion that Officer Farr acted unconstitutionally. For the reasons that follow, this holding requires that we reverse the grant of summary judgment in favor of the City on the deliberate indifference claim.
 
 
 32
 The Supreme Court has held that a City is liable on a "failure to train" claim when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205;[9] see also Zuchel v. City and County of Denver, 997 F.2d 730, 740-41 (10th Cir.1993) (explaining deliberate indifference standard). Ms. Williams offered evidence that City officials within the hiring process had expressed serious reservations about hiring Officer Farr due at least in part to his very poor driving record. The record also contains several incidents of Officer Farr's poor driving after he was hired by the City. More importantly, Ms. Williams presented evidence that City police officers commonly respond improperly to emergency calls. The district court did not address the alleged inadequacies in the City's driving training generally or with respect to Officer Farr in particular. The City does not argue on appeal that Ms. Williams' evidence on the City's alleged deliberate indifference to the need for more or different training is inadequate as a matter of law, nor can we so hold on this record. Accordingly, we reverse summary judgment for the City on this claim and remand for further proceedings.
 
 C.
 Arbitrary Conduct under Collins
 
 33
 Ms. Williams also alleges municipal liability on a second basis: she argues that the City is liable for its own unconstitutional conduct that resulted in Randy Bartel's death. The district court rejected this argument, believing that it was precluded by Hinton. In that case, we held that when a plaintiff "seeks to hold the city liable solely because of the actions of its individual officers," the city "may not be held liable where there was no underlying constitutional violation by any of its officers." Hinton, 997 F.2d at 782 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)(per curiam)) (emphasis added). Here, as opposed to Hinton and Heller, Ms. Williams asserts municipal liability under her second theory based upon the alleged unconstitutional conduct of the City policy makers themselves rather than on the unconstitutional conduct of Officer Farr or other individual defendants. Therefore, as we discuss below, Hinton and Heller are not dispositive.
 
 
 34
 In light of Collins, we conclude that the City may be liable on the basis of its own conduct even if no City employee is found to have committed a constitutional violation in his individual capacity. In Collins, the widow of a city employee sued the city, alleging that the city had denied her husband substantive due process by failing to train or warn him on the dangers of working in sewers. The Court analyzed the claim by addressing whether "the city's 'deliberate indifference' to Collins' safety was arbitrary government action that ... 'shock[s] the conscience' of federal judges." 503 U.S. at 126, 112 S.Ct. at 1069. The Court concluded that the City's failure to train, even assuming it amounted to deliberate indifference, was not conscience-shocking in the constitutional sense. Id. at 128, 112 S.Ct. at 1070. Implicit in this analysis is the premise that the City may be liable for its own deliberate indifference[10] if its conduct could "properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." Id.
 
 
 35
 In holding that the City may be liable for its own unconstitutional policy even if Officer Farr is ultimately exonerated, we emphasize the distinction between cases in which a plaintiff seeks to hold a municipality liable for failing to train an employee who as a result acts unconstitutionally, and cases in which the city's failure is itself an unconstitutional denial of substantive due process. Heller and Hinton are cases belonging in the first category. In those cases, the unconstitutional acts were committed by individual officers. Derivative liability against the city was predicated upon a municipal policy under which the city was allegedly legally responsible for the individual officer's unconstitutional conduct. In order to impose liability in such cases, the policy need not itself be unconstitutional. See Collins, 503 U.S. at 123, 112 S.Ct. at 1067-68. Rather, the inquiry is whether an otherwise constitutional policy is the moving force behind unconstitutional conduct by a municipal employee. See City of Canton, 489 U.S. at 389, 109 S.Ct. at 1205.[11]
 
 
 36
 In the second category of cases, liability against the city is sought not derivatively on the basis of unconstitutional conduct by an individual officer, but directly on the basis of the unconstitutional nature of the city's policy itself. Collins belongs in this category. In Collins, the widow of a municipal employee sued only the City alleging that the City violated her husband's constitutional rights by failing to warn of hazards in the workplace. The Court assumed that the plaintiff's allegations of the City's responsibility for the unsafe workplace were sufficient to hold the City liable for the actions of its agents, Collins, 503 U.S. at 124, 112 S.Ct. at 1068, and then turned to the question whether the plaintiff's complaint alleged a constitutional violation by the city, id. Significantly, the Court then did not assess whether any individual agent had acted unconstitutionally but rather considered whether the City's own conduct in failing to provide a safe workplace was itself "an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." Id. at 128, 112 S.Ct. at 1070. Fundamental to this analysis is the premise that a city may be liable when an unconstitutional city policy or custom injures someone even if no individual officer is found constitutionally liable. While a city may only act through its agents, it is the agents who implement the unconstitutional policy in their official capacities that are the focus of liability in a Collins case.
 
 
 37
 Municipal policy thus performs two separate functions, as the court in Collins attempted to clarify. In a Heller/Hinton case and in Canton, the inquiry is whether the policy may impose liability on the city solely for the unconstitutional acts of its employee. In such cases, the policy, even if constitutional, will nonetheless be a basis for municipal liability if that policy amounts to deliberate indifference to the rights of the public with whom the municipal employee comes in contact. In a Collins case, on the other hand, the inquiry is whether the policy or custom itself is unconstitutional so as to impose liability on the city for its own unconstitutional conduct in implementing an unconstitutional policy. See e.g., Garcia v. Salt Lake County, 768 F.2d 303, 310 (10th Cir.1985).
 
 
 38
 Although Ms. Williams is therefore not precluded by Hinton from making out a case of a direct constitutional violation by the City, the evidence she offers to support that violation does not meet the conscience-shocking standard required by Collins. Ms. Williams offered evidence that the City hired Officer Farr despite his poor driving record, against the recommendation of the executive director of the civil service commission, and despite reports by two psychologists recommending he not be hired without further testing. The City did not conduct that testing, nor did it require Officer Farr to take remedial training notwithstanding nine incidents of unacceptable driving and a prior accident in which Officer Farr was at fault for hitting another car under analogous circumstances. The record also contains evidence that the City generally did not require its police officers to comply with the applicable safety provisions.
 
 
 39
 While this conduct by the City should not be condoned, "[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.' " Collins, 503 U.S. at 129, 112 S.Ct. at 1070 (citation omitted). We cannot say that the conduct here "was so egregious, outrageous and fraught with unreasonable risk as to shock the conscience." Uhlrig, 64 F.3d at 576. Accordingly, we affirm summary judgment for the City on this claim.
 
 III.
 
 40
 We turn next to the issue of qualified immunity. Ms. Williams claims that Officer Farr deprived her son of substantive due process by causing the accident that took his life. In addition, she asserts that the Police Chief, the Denver Safety Manager, and the Civil Service Commission members acted unconstitutionally in hiring Officer Farr, in failing to give him special training, and in failing to require compliance with emergency driving requirements generally.[12]
 
 
 41
 Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating both that the defendant's conduct violated a constitutional right and that the law on the issue was clearly established. Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir.1995). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina, 960 F.2d at 1498.
 
 
 42
 Ms. Williams has failed to make the requisite showing. Although the very conduct need not have previously been held unlawful, see Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), Ms. Williams has cited no case with respect to her claims against any of the individual defendants, nor have we found one, that is sufficiently analogous to the facts here to persuade us that the law as to these claims was clearly established in June 1989. Indeed, this court did not hold that a defendant could be liable for harm directed at a limited group, rather than a particular individual, until our 1992 decision in Medina. Consequently, we affirm the grant of summary judgment against defendants individually on the basis of qualified immunity.[13]
 
 IV.
 
 43
 Finally, we address Ms. Williams' claim that she has been denied her constitutionally protected right of familial association with her son. In Trujillo, 768 F.2d 1186, we considered the circumstances which would produce a deprivation of these interests. We concluded that "intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." Id. at 1190.
 
 
 44
 Ms. Williams concedes on appeal that she cannot make the showing of intent required by Trujillo, arguing instead that its holding has been undermined by subsequent authority. Even if we were to agree that intervening case law has raised some question about the propriety of our ruling in Trujillo, a three-judge panel is not at liberty to overrule circuit precedent established by prior opinions. See United States v. Splawn, 963 F.2d 295, 297 (10th Cir.1992), aff'd on reh'g en banc, 982 F.2d 414 (10th Cir.1992), cert. denied, 508 U.S. 919, 113 S.Ct. 2365, 124 L.Ed.2d 271 (1993). "The proper avenue for raising these issues lies in a petition for en banc review." Id.
 
 V.
 
 45
 To summarize, we affirm the grant of qualified immunity to defendants individually on the ground that the law was not clearly established. We reverse the district court's ruling that Officer Farr's conduct was not unconstitutional as a matter of law and we therefore reverse the lower court's ruling that the City is not liable on the failure-to-train claim. Finally, we affirm the district court's holding that the City cannot be found liable on the basis of its own unconstitutional conduct, albeit on different grounds. We remand for further proceedings on the claim remaining against the City in light of this opinion.
 
 
 46
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 47
 STEPHEN H. ANDERSON, Circuit Justice, dissenting in part, concurring in part:
 
 
 48
 The majority opinion attempts to clarify the appropriate standard in this circuit for a substantive due process violation by stating that the defendant must act with reckless intent and that the conduct must "shock the conscience." While I agree that Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), indicates that a substantive due process violation requires arbitrary government conduct which shocks the conscience, the majority's statement of and application of the standard in this case leaves the law in this circuit confused and uncertain. In particular, in evaluating the conduct of the officer, to determine whether it is conscience shocking, the majority has incorporated a subjective state of mind component. While state of mind may be relevant to an evaluation of responsibility for a constitutional violation, it is simply irrelevant when the issue is whether government conduct is so arbitrary as to be conscience-shocking.[1] Furthermore, I do not agree with the majority's application of the standard to the facts of this case. I therefore dissent from section IIA of the majority opinion, in which the majority holds that the standard for a substantive due process violation is whether the officer, with reckless intent, engages in conscience-shocking conduct and further holds that Officer Farr's conduct met that standard. I concur in the remainder of the majority opinion, except I concur in the result only in section IIC.
 
 
 49
 As we have observed, "conscience-shocking" behavior "cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct." Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir.1995), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996). We do know, however, that it is a very high standard, requiring a high degree of culpability. Indeed, in Uhlrig we stated that:
 
 
 50
 [T]o satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. ... We do know ... that the "shock the conscience" standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist ... is not necessarily conscience shocking.
 
 
 51
 Id. (emphasis added); see also Abeyta v. Chama Valley Indep. Sch. Dist., No. 19, 77 F.3d 1253, 1256-57 (10th Cir.1996) (in discussing whether corporal punishment at school can violate substantive due process, we asked " 'whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience' ") (quoting Garcia ex. rel. Garcia v. Miera, 817 F.2d 650, 655 (10th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988)); Liebson v. New Mexico Corrections Dep't, 73 F.3d 274, 276 (10th Cir.1996) (quoting Uhlrig ).[2] In Uhlrig, we found no constitutional violation under the "shock the conscience" standard because the "[d]efendants did not engage in any conduct that was so egregious, outrageous and fraught with unreasonable risk so as to shock the conscience." Uhlrig, 64 F.3d at 576. See also Temkin v. Frederick County Comm'rs, 945 F.2d 716, 720 (4th Cir.1991) (describing conduct which shocks the conscience as conduct which " 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience.' ") (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir.1980)), cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).
 
 
 52
 The majority holds that the conduct of Officer Farr could be viewed as conscience-shocking. I disagree. As the majority states, the facts establish that at approximately 4:00 a.m., Officer Farr, in response to a request from another officer to back up the arrest of a car thief, drove down a major Denver boulevard at 60 m.p.h. in a 35 m.p.h. zone, with his overhead lights flashing but without his siren on, entered an intersection against a red light and struck the decedent's vehicle. While undeniably tragic, certainly negligent (perhaps grossly so), and reckless, a comparison of the facts of this case to other cases from our own and from other circuits demonstrates that these tragic facts by no means meet the high level of culpability necessary to shock the conscience in the constitutional sense.
 
 
 53
 I begin with Apodaca v. Rio Arriba County Sheriff's Dep't, 905 F.2d 1445 (10th Cir.1990), the case upon which the district court relied to conclude as a matter of law that Officer Farr's conduct was not unconstitutional. In Apodaca, the facts were that:
 
 
 54
 [Deputy] Romero was driving 55-65 miles per hour around a blind curve on which the regular speed limit was 35 miles per hour. It was after midnight, and had been raining and sleeting. Romero was not using his siren or flashing lights. [Plaintiff's decedent] was making a left turn out of the restaurant parking lot, when Romero rounded the curve and crashed into her car broadside.
 
 
 55
 Id. at 1446. We held that such conduct was negligent, and therefore did not rise to the level necessary for a § 1983 violation. Id. at 1447.
 
 
 56
 The majority strains to distinguish Apodaca, noting that the speeding officer in Apodaca had the right of way when he collided with the plaintiff's decedent, unlike Officer Farr who drove through a red light, that "Officer Farr was driving in violation of both state law and Department requirements governing emergency driving," maj. op. at 1016, and that the officer in Apodaca was responding to a burglary in progress, while Officer Farr had been requested on a non-emergency basis to back up the arrest of a car thief. In my view, those distinctions are very thin. While the officer in Apodaca did indeed have the right of way, he was also rounding a curve at almost double the posted speed limit, in wet and dangerous road conditions, with neither his siren nor his flashing lights in use. While he technically had the right of way when the accident occurred, his conduct is hardly less reckless or likely to cause an accident than was Officer Farr's in running a red light at also almost double the posted speed limit, but in dry, and presumably safer, driving conditions, and with his overhead lights flashing. The majority concedes that the fact that Officer Farr was driving in violation of both state law and Department requirements governing emergency driving is "not dispositive of the constitutional issue," id., nor should it be. It is not clear whether the officer in Apodaca was likewise in violation of applicable state and departmental requirements, but it is hard to imagine that he was in complete compliance when he rounded a curve at high speed in wet weather without using either his siren or flashing lights. Finally, the difference between responding to a silent burglar alarm at an automobile dealership (Apodaca ) and providing back-up to an arrest of a car thief is minute, at best.
 
 
 57
 More importantly, such fine distinctions cannot elevate essentially similar police behavior from negligent conduct to conduct so culpable and inappropriate as to literally shock the conscience and violate the Federal Constitution. As the Fourth Circuit observed in a case involving more egregious facts than those in this case, the officer's conduct "while disturbing and lacking in judgment" falls short of being conscience-shocking. Temkin, 945 F.2d at 723.
 
 
 58
 The majority attempts to rationalize its conclusion by shifting the focus away from the officer's conduct, and inquiring into his state of mind. Thus, the majority asserts that the evidence here "supports an inference that Officer Farr was speeding for speeding's sake, deliberately engaging in unjustified conduct that posed a great risk of harm to those in his path." Maj. op. at 1017. By conflating the deliberateness aspect of a § 1983 action with the standard necessary to establish an actual substantive due process violation, the majority confuses more than it clarifies. When we consider whether the officer's conduct violated the substantive due process clause of the constitution, we must assess that conduct objectively: is it such arbitrary government conduct as to shock the conscience? Collins, 503 U.S. at 126, 112 S.Ct. at 1069. Whether the officer's "mindset" was to speed, or to run red lights, or to drive without his siren and/or lights on, is utterly irrelevant to whether his conduct was so offensive to our fundamental notions of decency as to shock the conscience.[3]
 
 
 59
 Other cases from other circuits support my view that Officer Farr's conduct falls far short of the shock the conscience standard. See, e.g., Fagan v. City of Vineland, 22 F.3d 1296, 1300, 1307 (3d Cir.1994) (en banc) (finding no violation where police officer went on a high-speed chase in a residential neighborhood, disregarded traffic signs and signals, and where suspect's car ran a red light and collided with another car); Temkin, 945 F.2d at 718, 723 (finding no constitutional violation under the "shock the conscience" standard where officer observed suspect spinning wheels at gas station, gave chase with lights and sirens activated, proceeded along two-lane highway with varying population densities at high speeds (from 65 to 105 m.p.h.), where there were lots of cars and people along one part because of a carnival, where pursuing officer found out that the suspect had only stolen $17.00 worth of gas, where the chase violated departmental policy, and where both cars failed to negotiate a curve and hit plaintiff's car); Roach v. City of Fredericktown, 882 F.2d 294, 297 (8th Cir.1989) (finding collision resulting from officer's high-speed pursuit of vehicle with mismatched plates does not rise to level of gross negligence); Jones v. Sherrill, 827 F.2d 1102, 1107 (6th Cir.1987) (finding no § 1983 violation when officers drove 120-125 m.p.h. in traffic within city limits and suspect's car crossed centerline and collided with plaintiff's husband's car); Cannon v. Taylor, 782 F.2d 947, 950 (11th Cir.1986) (finding no § 1983 violation where police officer, responding to an emergency call, drove at a speed of 46 m.p.h. in a 30 m.p.h. zone within city limits, without flashing lights or siren, and struck plaintiff as she drove through an intersection); Smith v. Lexington Fayette Urban County Gov't, 884 F.Supp. 1086, 1094 (E.D.Ky.1995) (finding no constitutional violation under "shocks the conscience" standard where "police officers initiated a high-speed pursuit of a suspected DUI at close distances, in the city limits where there was vehicular and pedestrian traffic, in disregard of traffic signals, and ... the police officers failed to use their emergency equipment, in violation of police department regulations, policy and law"); Magdziak v. Byrd, No. 94C1876, 1995 WL 704394, at * 5 (N.D.Ill. Nov.29, 1995)(finding no violation under "shocks the conscience" standard where "defendant ... engaged in a highspeed pursuit [without operating his siren or lights] on an expressway at 3:00 a.m .... [and] the pursued vehicle turned off I-290 on an exit ramp, ignored a red light, and collided with plaintiff's decedent."), aff'd, 96 F.3d 1045 (7th Cir.1996); cf. Wood v. Ostrander, 879 F.2d 583, 588, 596 (9th Cir.1989) (finding plaintiff stated a claim for a § 1983 violation when police stranded plaintiff in a dangerous neighborhood at night and she was subsequently raped), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); White v. Rochford, 592 F.2d 381, 385-86 (7th Cir.1979) (finding plaintiff stated a claim for a § 1983 violation when police left small children unattended in abandoned car after arresting driver).
 
 
 60
 In sum, my survey of the case law reveals that courts very rarely find that the operation of a police vehicle in the performance of official duties shocks the conscience in the constitutional sense. The majority does not even attempt to cite cases where the court has found such conduct to be conscience-shocking. I have provided a partial list of cases where courts have specifically found such conduct is not conscience-shocking. The reason for this is obvious: courts demand a very high level of culpability before they will conclude that police performing their duties, albeit negligently, carelessly, or recklessly, have violated the substantive due process clause of the constitution. See Hill v. Shobe, 93 F.3d 418, 421 (7th Cir.1996) ("[M]otor vehicle accidents caused by public officials or employees do not rise to the threshold of a constitutional violation actionable under § 1983, absent a showing that the official knew an accident was imminent but consciously and culpably refused to prevent it.").
 
 
 61
 Additionally, a survey of state law cases reveals why so few of these high-speed policy pursuit cases succeed in federal court--they are typical negligence/gross negligence state tort law cases brought typically, and appropriately, in state court. See, e.g., Natseway v. City of Tempe, 184 Ariz. 374, 909 P.2d 441 (App.1995); Urban v. Village of Lincolnshire, 272 Ill.App.3d 1087, 209 Ill.Dec. 505, 651 N.E.2d 683, appeal denied, 163 Ill.2d 591, 212 Ill.Dec. 440, 657 N.E.2d 641 (1995); Pletan v. Gaines, 494 N.W.2d 38 (Minn.1992); Peoples v. Conway, 897 S.W.2d 206 (Mo.Ct.App.1995); Canico v. Hurtado, 144 N.J. 361, 676 A.2d 1083 (1996); Clark v. Burke County, 117 N.C.App. 85, 450 S.E.2d 747 (1994); Black v. Shrewsbury Borough, 675 A.2d 381 (Pa.Commw.Ct.1996); Harris County v. Ochoa, 881 S.W.2d 884 (Tex.Ct.App.1994); Estate of Cavanaugh v. Andrade, 550 N.W.2d 103 (Wis.1996); see also, Haynes v. Hamilton County, 883 S.W.2d 606, 612-13 (Tenn.1994) (collecting cases).
 
 
 62
 Finally, I note that the Ninth Circuit has recently defined gross negligence as follows:
 
 
 63
 A person acts with gross negligence when the person intentionally acts unreasonably with regard to a known risk or acts unreasonably with regard to a risk so obvious that the person must be assumed to have been aware of it. And the magnitude of the risk is such that it is highly probable that harm will follow.
 
 
 64
 L.W. v. Grubbs, 92 F.3d 894, 899 (9th Cir.1996). At most, Officer Farr's conduct meets that description. I would hold that Officer Farr's conduct, while negligent, perhaps grossly so, does not amount to the kind of arbitrary conduct which shocks the conscience in a constitutional sense. I therefore dissent from section IIA.
 
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Ms. Williams sued the Chief of Police, the Manager of Safety for the City and County of Denver, and the members of the Denver Civil Service Division individually and in their official capacities. We will refer to these defendants in their official capacities collectively as the City
 
 
 [2]
 The record also contains some evidence that Officer Farr received adequate training, including driving skills training in excess of the City's requirements, and that he did not indicate a pattern of excessive risk-taking or thrill-seeking behavior. As we have mentioned, however, on a motion for summary judgment the court is required to review the record in the light most favorable to the opposing party
 
 
 [3]
 In so doing, we note our holding in Part III that Officer Farr is entitled to qualified immunity because the law was not clearly established. Nonetheless, as we discuss in Part IIB infra, the City may be liable for its inadequate hiring and training policies if Officer Farr acted unconstitutionally. The grant of qualified immunity does not therefore eliminate Ms. Williams' claim against the City based on City of Canton. See, e.g., Medina v. City & County of Denver, 960 F.2d 1493, 1499-1500 (10th Cir.1992). We must therefore first assess whether Ms. Williams has created a fact issue on the constitutionality of Officer Farr's conduct
 
 
 [4]
 As we recognized in Uhlrig, "recklessness" satisfies the scienter requirement of § 1983:
 [I]n reckless conduct, the defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff.
 64 F.3d at 573 n. 8.
 
 
 [5]
 This provision was located at Colo.Rev.Stat. § 42-4-106 at the time of the collision. It was renumbered without significant amendment effective January 1, 1995, and now appears at Colo.Rev.Stat. § 42-4-108
 
 
 [6]
 We make an additional comment with respect to our opinion in Apodaca. The district court here placed particular emphasis on footnote three of that opinion, in which we held as a matter of law that the plaintiffs' allegations were grounded in negligence. We observed in Apodaca that as a practical matter, because any risk to others was reciprocally created for the officer himself, it would be hard to imagine the officer being "truly indifferent to the risks he was creating, which is a necessary characteristic of recklessness." Id. at 1447 n. 3. We caution against reading this observation so broadly that it proves too much. Under our holding in Medina, 960 F.2d at 1496, an officer's conduct can be reckless if he unreasonably disregards an obvious risk of serious harm even if that conduct exposes the officer himself to that risk. See supra note 2 and accompanying text
 
 
 [7]
 The officer who called for a backup testified in his deposition that he had reviewed the tape of the call and that "I think it goes without saying if anyone would listen to the tape they would say that I sounded--I wasn't excited. I sounded in control." Aplt.App., vol. IV, at 1009
 
 
 [8]
 The dissent takes the puzzling position that ascertaining whether an officer's conduct shocks the conscience does not entail an inquiry into that officer's state of mind. To the contrary, in assessing whether an official's conduct rises to the level of a substantive due process violation, this court has repeatedly pointed out that the official's state of mind is significant. See Abeyta v. Chama Valley Indep. Sch. Dist. No 19, 77 F.3d 1253, 1256-57 (10th Cir.1996) (abuse of power where force applied disproportionate to need and inspired by malice or sadism); Liebson v. New Mexico Corrections Dep't, 73 F.3d 274, 277 (10th Cir.1996) (no substantive due process violation where officials did not act with knowledge of conscience-shocking facts); Uhlrig v. Harder, 64 F.3d 567, 576 (10th Cir.1995)(officials' conduct not conscience-shocking where they did not intend to injure and were not indifferent to the risk of injury), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853(1996). In so doing, we have recognized the common-sense principle that conduct which poses an imminent risk of serious harm and which is motivated by an improper purpose is unquestionably more likely to shock the conscience than the same actions done for legitimate reasons. Indeed, the dissent's assertion that state of mind is irrelevant to the substantive due process inquiry appears contrary to the position the dissent articulates at page 9, where it cites Hill v. Shobe, 93 F.3d 418, 421 (7th Cir.1996), for the proposition that a constitutional violation cannot be shown by official conduct "absent a showing that the official knew an accident was imminent but consciously and culpably refused to prevent it." As set out in text, the record here of Officer Farr's deplorable driving history, including his prior accident under similar circumstances, allows the inference that "he had actual knowledge of impending harm which he consciously refused to prevent." Id
 Moreover, our observation that Officer Farr could be viewed as speeding for its own sake rather than responding to a situation in which that degree of speed was justified is also relevant to whether the conduct was justified by a valid police concern. This inquiry is indisputably part of the substantive due process determination.
 
 
 [9]
 The Court made clear in City of Canton that a City is liable for its deliberate indifference to the unconstitutional conduct of its employees regardless of the degree of fault a plaintiff must show to establish the underlying claim of constitutional violation. 489 U.S. at 388 n. 8, 109 S.Ct. at 1204 n. 8
 
 
 [10]
 Accord Chew v. Gates, 27 F.3d 1432, 1438-39 (9th Cir.1994), cert. denied, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); Fagan v. City of Vineland, 22 F.3d 1283, 1291-93 (3d Cir.), affirmed on other grounds, 22 F.3d 1296 (3d Cir.1994)(en banc); Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir.1992); Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir.1992)
 
 
 [11]
 Citing Canton, the Court in Collins said:
 [W]e rejected the city's argument that only unconstitutional policies can create municipal liabilities under the statute. Instead, we concluded that if a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation. In particular, we held that the inadequate training of police officers could be characterized as the cause of the constitutional tort if--and only if--the failure to train amounted to "deliberate indifference" to the rights of persons with whom the police come into contact.
 503 U.S. at 123-24, 112 S.Ct. at 1067 (citations omitted)(emphasis added).
 
 
 [12]
 It is unclear whether Ms. Williams asserts claims against these defendants individually on the basis of their own unconstitutional conduct or on the basis of their supervisory liability or both. A supervisor may be held liable for the unconstitutional acts of an inferior upon proof of actual knowledge of or acquiescence in the constitutional deprivations. See Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir.1992), cert. denied, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Our holding that defendants are entitled to qualified immunity applies to claims under both theories
 
 
 [13]
 We recognize that the Supreme Court has emphasized "the desirability," in resolving immunity claims, of determining first whether the plaintiff has established the violation of a constitutional right before examining whether that right was clearly established at the relevant time. See Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 1793-94, 114 L.Ed.2d 277 (1991). In this case, however, the existence of a constitutional violation requires assessing whether defendants' conduct shocks the conscience. We have held in Part IIC supra that Ms. Williams' evidence on this issue precludes judgment as a matter of law on the existence of a constitutional violation. We therefore resolve the immunity issue on the second ground
 
 
 [1]
 The Supreme Court and we have frequently said that § 1983 liability requires deliberate conduct by a state actor. See, e.g., Collins v. City of Harker Heights, 503 U.S. 115, 127 n. 10, 112 S.Ct. 1061, 1069 n. 10, 117 L.Ed.2d 261 (1992) (" 'Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.' ") (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)); City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (" '[M]unicipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers.") (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality opinion)); Jojola v. Chavez, 55 F.3d 488, 490 (10th Cir.1995) (" '[L]iability under § 1983 must be predicated upon a "deliberate " deprivation of constitutional rights by the defendant,' and not on negligence.") (quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir.1992), cert. denied, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993))
 
 
 [2]
 The majority believes it "puzzling" that I question the propriety of inquiring into the officer's subjective state of mind when evaluating the officer's conduct. While not explicitly stating so, the majority relies upon language from Garcia to support its view. Garcia itself qualifies its use of the term "malice or sadism":
 While this standard incorporates a subjective intent element of "malice or sadism," this element is largely redundant, because whenever "the force applied caused injury so severe, was so disproportionate to the need presented, and ... amounted to a brutal and inhumane abuse of official power literally shocking to the conscience," we should presume that the defendant had the requisite state of mind.
 Garcia, 817 F.2d at 655 n. 7 (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir.1980)). Even under Garcia, in which the conduct in question was the beating of a young student by school personnel, it is the nature and quality of the conduct which is important. If the conduct is egregious enough, the requisite malicious state of mind will simply be presumed. That is different from speculating about an officer's state of mind while driving his car in the performance of his duties, and determining whether that state of mind somehow transforms his conduct into a constitutional violation. To have the same "malicious and sadistic" state of mind in a high-speed police pursuit as a teacher would have when beating a student, the officer's state of mind would be virtually suicidal--maliciously and sadistically hoping to get into a wreck with another car, thereby potentially killing himself.
 
 
 [3]
 My view that the officer's conduct must be viewed objectively, without regard to his state of mind in determining whether a substantive constitutional violation has occurred, finds support in other contexts where the Supreme Court has declared the subjective intent of the officer irrelevant. See, e.g., Whren v. United States, 517 U.S. 806, ----, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); cf. Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) ("These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.")