**Robert Lee COGGIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 03–02–00690–CR.

Court of Appeals of Texas,
Austin.

Oct. 9, 2003.

Donald T. Cheatham, Austin, for appellant.

Todd A. Blomerth, Blomerth & Payne, Lockhart, for appellee.

Before Chief Justice LAW, Justices PATTERSON and DALLY.*

## OPINION

JAN P. PATTERSON, Justice.

Robert Lee Coggin appeals his conviction for the offense of disorderly conduct. A jury found that he intentionally or knowingly made an offensive gesture by raising his middle finger in a public place, which tends to incite an immediate breach of the peace. *See* Tex. Pen.Code Ann. § 42.01(a)(2) (West 2003). In his first three points of error, appellant contends that his conviction should be overturned because the statute is unconstitutional: facially unconstitutional by impermissibly restricting protected free speech, void for vagueness and overbreadth, and unconstitutional as applied by punishing protected free speech. In his fourth and fifth points of error, appellant challenges the legal and factual sufficiency of the evidence. For the reasons stated below, we reverse the judgment of conviction and render a judgment of acquittal.

## BACKGROUND

On October 25, 2001, appellant was driving in the left lane south on Colorado Street (U.S. Highway 183) in Lockhart. Appellant's vehicle was a white car with spotlights on the side and handcuffs hanging from the rearview mirror. Appellant came upon another vehicle in the left lane that was traveling more slowly. There is nothing in the record to show that other persons or automobiles were present. Appellant proceeded to tailgate the car, flash his headlights, and motion for the car to move into the right lane so that he could pass. The other vehicle was driven by twenty-two-year-old John Pastrano, a jailer with the Caldwell County Jail; his wife, Robin, was a passenger. Pastrano, thinking that he was being pulled over by an unmarked police car, moved into the right lane. As appellant passed Pastrano's car, he allegedly gestured with his raised middle finger—or "shot the bird" [1]—at Pastrano and his wife.

---

* Before Carl E.F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment.

*See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. The "bird" is "an obscene gesture of con-

Pastrano, who testified that the incident "made [him] angry," called 911 and made a report of reckless driving. Officer James Cowan with the Lockhart Police Department responded to the dispatch and pulled appellant over soon after the call. After speaking with Pastrano, who had been called to the scene by the dispatcher, Cowan issued appellant a citation for the class C misdemeanor of "disorderly conduct-gesture." Appellant pled not guilty and initially waived a jury trial and counsel. He later retained counsel and in a one-day jury trial on October 21, 2002, was found guilty of the offense of disorderly conduct and fined $250.

## ANALYSIS

That this conviction rests upon the unseemly gesture alone is clear from the charging instrument. Thus, appellant was not accused of threatening or otherwise endangering others on the road, or of reckless driving or tailgating. Nor does the State contend that the conduct is obscene. Appellant was charged solely with disorderly conduct by the gesture of extending his middle finger.

### Constitutionality of Texas Penal Code Section 42.01(a)(2)

In his first and second points of error, appellant contends that section 42.01(a)(2) is unconstitutional on its face because it impermissibly proscribes rights of free speech and expression protected by the First and Fourteenth Amendments to the United States Constitution and Article I, section 8 of the Texas Constitution and is also vague and overbroad. Ordinarily, we do not reach constitutional issues unless necessary. We will nevertheless discuss these points of error in the interest of fully addressing the parties' primary arguments.

▮ Before addressing the substance of appellant's constitutional claims, we conclude that we need not address appellant's Texas constitutional claims. Appellant has proffered no argument or authority concerning the protection afforded by the Texas Constitution or how that protection differs from the protection afforded by the United States Constitution. State and federal constitutional claims should be argued in separate grounds, with separate substantive analysis or argument provided for each ground. *Muniz v. State*, 851 S.W.2d 238, 251 (Tex.Crim.App.1993); *Heitman v. State*, 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App.1991). We will not make appellant's state constitutional arguments for him. *Muniz*, 851 S.W.2d at 252.

▮ We begin with the presumption that a statute is constitutional. Tex. Gov't

tempt made by pointing the middle finger upward while keeping the other fingers down." *Merriam–Webster OnLine*, at http://www.m-w.com. This gesture is of ancient origin:

> [T]he middle-finger jerk was so popular among the Romans that they even gave a special name to the middle digit, calling it the impudent finger: *digitus impudicus*. It was also known as the obscene finger, or the infamous finger, and there are a number of references to its use in the writings of classical authors. . . . The middle-finger jerk has survived for over 2,000 years and is still current in many parts of the world, especially the United States.

Desmond Morris et al., *Gestures* 81–82 (1979). This symbolic gesture has come to mean many things to many people in many contexts, including "displeasure" and "mild annoyance." *See* Martha Irvine, *Is the Middle Finger Losing Its Badness?*, AP Online, Feb. 23, 2003, *available at* 2003 WL 13367718 (reprinted in several newspapers). See also the cover of the September 20, 2003 issue of *The Economist* magazine, depicting a cactus in a desert panorama giving the gesture because of displeasure with the outcome of the Cancún trade talks.

Code Ann. § 311.021(1) (West 1998). A facial challenge to the constitutionality of a statute imposes a heavy burden because the challenger must establish that no set of circumstances exists under which the act would be valid. *Briggs v. State,* 789 S.W.2d 918, 923 (Tex.Crim.App.1990); *Ex parte Anderson,* 902 S.W.2d 695, 699 (Tex. App.-Austin 1995, pet. ref'd).

 The statute under which appellant was charged provides:

§ 42.01. Disorderly Conduct

(a) A person commits an offense if he intentionally or knowingly:

(2) makes an offensive gesture or display in a public place, and the gesture or display tends to incite an immediate breach of the peace.

Tex. Pen.Code Ann. § 42.01(a)(2). The First Amendment prohibits laws that abridge freedom of speech.[2] U.S. Const. amend. I. There are, however, certain classes of speech that are not afforded the protection of the First Amendment. "Fighting words" are one such class of speech, which are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Texas courts have uniformly held that section 42.01 applies to fighting words. *Jimmerson v. State,* 561 S.W.2d 5, 7 (Tex.Crim.App.1978) (holding that section 42.01(a)(4), by implication, applies only to fighting words); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 785 (Tex.App.-El Paso 1996, writ denied) (holding that section 42.01(a)(1) applies only to

fighting words); *Ross v. State,* 802 S.W.2d 308, 314–15 (Tex.App.-Dallas 1990, no pet.); *Estes v. State,* 660 S.W.2d 873, 875 (Tex.App.-Fort Worth 1983, pet. ref'd) (holding that section 42.01(a)(1) and (2) apply only to fighting words). Accordingly, we hold that the conduct proscribed under section 42.01(a)(2) falls within the "fighting words" exception and does not violate rights of free speech and expression protected by the First and Fourteenth Amendments to the United States Constitution. We overrule appellant's first point of error.

 Concerning appellant's second point of error challenging the constitutionality of section 42.01(a)(2) for vagueness and overbreadth, a statute is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice that the statute forbids the contemplated conduct and if it encourages arbitrary and erratic arrests and convictions. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). To determine whether the doctrine applies, we use a two-step process. First, we determine if the law gives a person of ordinary intelligence fair warning of the prohibited act. Second, we determine if the law provides explicit standards for enforcement by those who apply them. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). However, if the literal scope of the statute impinges on a First Amendment freedom, "the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). On the other hand,

---

**2.** The gesture of extending one's middle finger can be construed as speech because it has a well-known connotation. *See Burnham v. Ianni,* 119 F.3d 668, 674 (8th Cir.1997) (citing *Spence v. Washington,* 418 U.S. 405, 411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)) ("Non-

verbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it, regardless of whether it is actually understood in a particular instance in such a way.").

the right of free speech is not absolute at all times and under all circumstances. A statute is impermissibly overbroad when, " 'in addition to proscribing activities which may constitutionally be forbidden, it sweeps within its coverage speech or conduct which is protected by the First Amendment.' " *Bynum v. State*, 767 S.W.2d 769, 772 (Tex.Crim.App.1989) (quoting *Clark v. State*, 665 S.W.2d 476, 482 (Tex.Crim.App.1984)).

A statute narrowly drawn to define and punish specific conduct lying within the domain of state power, such as the use in a public place of words likely to cause a breach of the peace, is not unconstitutionally vague. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–74, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). However, the Supreme Court has struck down statutes not limited in scope to fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace. *See City of Houston v. Hill*, 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Gooding v. Wilson*, 405 U.S. 518, 523, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

Appellant urges that section 42.01(a)(2) is vague and overbroad because it does not define "offensive gesture or display," "incite," "immediate," or "breach of the peace." A statute is not unconstitutionally vague merely because it fails to define words or phrases. *Engelking v. State*, 750 S.W.2d 213, 215 (Tex.Crim.App. 1988); *Ahearn v. State*, 588 S.W.2d 327, 338 (Tex.Crim.App.1979). Statutory words are to be "read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011(a) (West 1998). When words are not defined in a statute, they are ordinarily given their plain meaning unless the statute clearly shows that they were used in some other sense. *Daniels v.*

*State*, 754 S.W.2d 214, 219 (Tex.Crim.App. 1988); *Ely v. State*, 582 S.W.2d 416, 419 (Tex.Crim.App.1979). Words defined in dictionaries with meanings so well known as to be understood by a person of ordinary intelligence have been held not to be vague and indefinite. *Floyd v. State*, 575 S.W.2d 21, 23 (Tex.Crim.App.1978); *Anderson*, 902 S.W.2d at 700. What we must do, then, is "to find the meaning of some not very difficult words." *Northern Sec. Co. v. United States*, 193 U.S. 197, 401, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

The courts have defined some of the terms which appellant challenges as vague. The language "offensive gesture or display" is somewhat similar to the statute the Supreme Court upheld in *Chaplinsky*, prohibiting an "offensive, derisive or annoying word." 315 U.S. at 569, 62 S.Ct. 766. In that case, the Supreme Court cited with approval the test for offensiveness set forth by the New Hampshire court: "what men of common intelligence would understand would be words likely to cause an average addressee to fight." *Id.* at 573, 62 S.Ct. 766. Texas courts have defined and interpreted the term "breach of the peace" to mean an act that " 'disturbs or threatens to disturb the tranquility enjoyed by the citizens.' " *Woods v. State*, 152 Tex.Crim. 338, 213 S.W.2d 685, 687 (1948) (quoting *Head v. State*, 131 Tex.Crim. 96, 96 S.W.2d 981, 982 (1936)).

We next look to common definitions of "gesture," "incite," and "immediate." A gesture is the "use of motions of the limbs or body as a means of intentional expression," *Webster's Third New International Dictionary* 953 (1986) (hereinafter *Webster's* ), or a "motion of the body calculated to express a thought or emphasize a certain point," *Black's Law Dictionary* 696 (7th ed.1999) (hereinafter *Black's* ). To incite is to "move to a course of action; stir

up; spur on," *Webster's* 1142, or to provoke, *Black's* 765. Immediate means "occurring, acting, or accomplished without loss of time; made or done at once; instant," *Webster's* 1129, or "occurring without delay," *Black's* 751. The statute does not clearly show that the words "gesture," "incite," and "immediate" were used in a sense different from their plain meaning; rather, these words are so well known that, in the context of the statute, it would be difficult to attribute any other meaning to them. Given these common, plain definitions, we cannot say that the statute fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *Floyd,* 575 S.W.2d at 23.

 Section 42.01(a)(2) is narrowly drawn to give a person of ordinary intelligence a fair warning that the State prohibits the use of fighting words in a public place. The statute also provides explicit standards for enforcement by only limiting the use of these words in public places when they disturb or threaten to disturb the tranquility enjoyed by the citizens. Thus, the statute is not too vague for a criminal law. Furthermore, because the statute applies only to fighting words, it is not overbroad in proscribing conduct protected by the First Amendment. We overrule appellant's second point of error.

 In his third point of error, appellant contends that section 42.01(a)(2) is unconstitutional as applied to him because there was no evidence of any "immediate danger or threat" from the people who witnessed his gesture. The State responds that appellant has waived this point of error because he did not raise it below. We agree. A contention that a statute is unconstitutional as applied to an accused must be asserted in the trial court or it is waived. *See Curry v. State,* 910 S.W.2d 490, 496 n. 2 (Tex.Crim.App.1995); *Garcia v. State,* 887 S.W.2d 846, 861 (Tex.Crim.

App.1994); *Bader v. State,* 15 S.W.3d 599, 603 (Tex.App.-Austin 2000, pet. ref'd). Here, there was no objection in the trial court to the constitutionality of section 42.01(a)(2) "as applied" to appellant. Thus, appellant did not preserve this point of error for our review.

### Sufficiency of the Evidence

 In his fourth point of error, appellant challenges the legal and factual sufficiency of the evidence. The State responds that appellant failed to preserve error on these challenges. To the contrary, an appellant may challenge both the legal and factual sufficiency of the evidence for the first time on appeal. *Rankin v. State,* 46 S.W.3d 899, 901 (Tex.Crim. App.2001); *Grayson v. State,* 82 S.W.3d 357, 358–59 (Tex.App.-Austin 2001, no pet.) (citing *Givens v. State,* 26 S.W.3d 739, 741 (Tex.App.-Austin 2000, pet. ref'd)). Furthermore, appellant requested a motion for instructed verdict at trial, which is a challenge to the legal sufficiency of the evidence. *Grayson,* 82 S.W.3d at 358 (citing *Williams v. State,* 937 S.W.2d 479, 482 (Tex.Crim.App.1996)).

 When both the legal and factual sufficiency of the evidence are challenged, we must first determine whether the evidence is legally sufficient to support the judgment. *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996). When reviewing legal sufficiency, we view the evidence in the light most favorable to the judgment and determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim.App.2000). We do not examine the fact finder's weighing of the evidence, but merely determine whether there is evidence supporting the judgment. *Clewis,* 922 S.W.2d at 132 n. 10.

For a rational trier of fact to have found appellant guilty of the offense of disorderly conduct by gesture, the State must have adduced proof to establish, beyond a reasonable doubt, that

(a) appellant

(b) intentionally or knowingly

(c) made an offensive gesture

(d) in a public place

(e) that tends to incite an immediate breach of the peace.

*See* Tex. Pen.Code Ann. § 42.01(a)(2). Two of the elements were not at issue. The Pastranos and appellant testified that the incident occurred on a highway, which is a public place—albeit here the people involved were in their respective vehicles. *Id.* § 1.07(a)(40) (West 2003). Whether the gesture is offensive was also not at issue. "The extended middle finger, or *digitus impudicus*, is an ancient opprobrious gesture that often has obscene implications." Betty J. Bauml & Franz H. Brauml, *A Dictionary of Gestures* 71 (1975). Both of the Pastranos testified that the gesture means "f--- off" or "f--- you," which is generally considered to be offensive.[3] Appellant did not testify about his understanding of the meaning of the gesture.

 Whether appellant made the gesture was in question. John Pastrano testified that appellant "shot me the bird" with his right hand when passing Pastrano's vehicle. Robin Pastrano testified similarly: "I looked, because I was curious to see who it was, and I saw him flipping us off." Both positively identified appellant in the courtroom as the man who made the gesture. Appellant denied making the gesture, although he testified that he has "given the bird to people on many occasions."

Viewing the evidence in the light most favorable to the judgment, the evidence was legally sufficient to establish that appellant made the gesture.

 Thus, we are left with the question of whether appellant's gesture tends to incite an immediate breach of the peace. "Actual or threatened violence is an essential element of a breach of the peace." *Woods*, 213 S.W.2d at 687. The test is whether the words, "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen*, 403 U.S. at 20, 91 S.Ct. 1780; *see also Virginia v. Black*, 538 U.S. 343, ——, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003).

 Whether particular words constitute fighting words is a question of fact. *Duran*, 921 S.W.2d at 785. This "require[s] careful consideration of the actual circumstances surrounding the expression, asking whether the expression 'is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)). Language that is merely harsh and insulting does not generally rise to the level of fighting words; derisive or annoying words only rise to such level when they plainly tend to excite the addressee to a breach of the peace. *Duran*, 921 S.W.2d at 785. It is not enough that the words merely arouse anger or resentment. *See Skelton v. City of Birmingham*, 342 So.2d 933, 937 (Ala.Crim.App.1976). Anything short of the use of fighting words does not constitute a violation of the statute. *Jimmerson*, 561 S.W.2d at 7.

---

**3.** Nevertheless, the opprobrium of this gesture may be in decline. *See* Irvine, *supra* note 1 ("These days, 'the bird' is flying everywhere— and, in many instances, losing its taboo status, especially among the younger set.").

Here, the record and circumstances of this case do not demonstrate that appellant's gesture "tends to incite an immediate breach of the peace." Tex. Pen.Code Ann. § 42.01(a)(2). John Pastrano, one of two witnesses to the incident, testified as follows:

Q. What was your reaction when this happened, sir?

A. It made me angry. It kind of, you know, resulted back into, you know, as if I wanted to react to it, as in an angry mode, you know, to somewhat defend, you know, myself, as well as the disrespect of my wife.

Q. And what did you do as a result of that?

A. I went ahead and dialed 9–1–1 due to the fact—because the vehicle had went on after that.

Although the gesture may have been provocative, there is no evidence that Pastrano was moved to violence or restrained himself from retaliating. Instead, he had the composure to call 911 on his cell phone and report not the gesture but reckless driving. Robin Pastrano similarly testified that she was angry:

Q. How—what did you think of that gesture? How did that affect you?

A. I was angry and scared and upset all at one time.

Q. Okay. Do you find that—that gesture offensive to you, ma'am?

A. Yes, sir.

* * *

Q. How long did you stay upset about this?

A. A few days, it made me upset, maybe two or three days. Not that not [sic] long, but it did make me very upset.

There is no showing that Pastrano and his wife were in fact violently aroused or that appellant intended such a result. *See Cohen,* 403 U.S. at 20, 91 S.Ct. 1780. Taking serious offense does not necessarily lead to disturbing the peace, and we may not prohibit conduct on that ground alone. *See Johnson,* 491 U.S. at 408–09, 109 S.Ct. 2533. "The fact that speech arouses some people to anger is simply not enough to amount to fighting words in the constitutional sense." *Cannon v. City & County of Denver,* 998 F.2d 867, 873 (10th Cir.1993).

The State attempts to equate Pastrano's reaction to that of the high school principal in *Estes,* who testified that when a student directed the gesture at him at a graduation ceremony, he reacted with "shock and anger, but ... resisted 'an animal instinct to retaliate.'" 660 S.W.2d at 874. The circumstances in *Estes* differ. There, the setting was a formal ceremony in a public arena, which carries with it an expectation of decorum and civility. The principal was in a position of authority over the student, and they knew each other. Moreover, the student made the gesture "at a distance of not more than a few inches from the principal's face," in disregard of the principal and the ceremony. *Id.* Here, a motorist, one stranger to another,[4] made the gesture as he sped past the other car. The incident was over in a matter of seconds, and the encounter was not in close proximity or in the context of a public gathering.

We agree that the gesture—repugnant, distasteful, and crass as it is— could tend to incite an immediate breach of the peace in a different context. In some circumstances, it may accompany or be attendant to "road rage" or reckless driving, which may be prosecuted under Texas law. *See* Tex. Transp. Code Ann.

---

4. Both appellant and Pastrano testified that they had never seen the other before.

§ 545.401(a) (West 1999) (person drives recklessly if "drives a vehicle in wilful or wanton disregard for the safety of persons or property"); *see also Benge v. State,* 94 S.W.3d 31, 35–36 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (citing Tex. Pen. Code Ann. § 22.02(a)(2) (West 2003)) (reckless driving can be lesser-included offense of aggravated assault with motor vehicle). But given the circumstances—the brief exposure to the gesture as one car passed the other, made stranger to stranger, causing momentary hostility on Pastrano's part—we cannot conclude that appellant's conduct tends to incite an immediate breach of the peace. There was no actual or threatened violence, "which is an essential element of a breach of the peace." *Woods,* 213 S.W.2d at 687. That the gesture may be thrust upon unsuspecting or sensitive viewers falls short of the type of conduct in a public place that would incite those present to violence. *See Cohen,* 403 U.S. at 21–22, 91 S.Ct. 1780 (in the presence of many people at a courthouse, wearing jacket bearing the term "F--- the draft" did not constitute fighting words).

Furthermore, to incite an immediate breach of the peace contemplates a face-to-face encounter, such as occurred in *Estes,* or at least something more than the impersonal, brief encounter of one motorist passing another. For example, a motorist shouting an obscenity and making the same gesture to a group of abortion protestors did not rise to the level of fighting words because the vehicle was across the street from the group and traveling at a high rate of speed. *Sandul v. Larion,* 119 F.3d 1250, 1255 (6th Cir.1997). When a passing motorist shouted "sooey" to a police officer, he did not violate the statute because there was "no direct face-to-face contact or other exigent circumstances." *Garvey v. State,* 537 S.W.2d 709, 711 (Tenn.Crim.App.1975); *see also Matter of Welfare of S.L.J.,* 263 N.W.2d 412, 420 (Minn.1978) (when young girl shouted obscenity to police officer who was standing fifteen feet away "rather than eye-to-eye, there was no reasonable likelihood that [the words] would tend to incite an immediate breach of the peace or to provoke violent reaction by an ordinary, reasonable person"); *Hershfield v. Commonwealth,* 14 Va.App. 381, 417 S.E.2d 876, 877–78 (1992) (when one neighbor shouted obscenity to another, "distance and barriers" precluded an immediate breach of the peace).

Viewing the evidence in the light most favorable to the jury's verdict, a jury rationally could not have found beyond a reasonable doubt that appellant's gesture tends to incite an immediate breach of the peace. In making this determination, we have adhered to a scrupulous reading of the facts, a standard not met by the dissent's departure from and over-characterization of the record.[5] We therefore sustain appellant's fourth point of error that the evidence was legally insufficient to support the judgment of conviction. In light of our disposition, we need not address appellant's factual sufficiency challenge or his fifth point of error challenging probable cause to charge him with a crime.

## CONCLUSION

We hold that the evidence was legally insufficient to establish that appellant's gesture tends to incite an immediate breach of the peace. Because the evidence is legally insufficient to support appellant's guilt, we reverse the judgment of conviction and render a judgment of acquittal.

---

5. For example, nowhere in the record does it state that Coggin forced the Pastranos over. Pastrano testified that he "put on [his] signal light and moved to the outside lane" after Coggin flashed his headlights.

*Burks v. United States,* 437 U.S. 1, 16–18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (holding that double jeopardy bars retrial when reviewing court finds evidence legally insufficient); *Clewis,* 922 S.W.2d at 133 (reviewing court must render judgment of acquittal upon determination of legal insufficiency).

W. KENNETH LAW, Chief Justice, filed a dissenting opinion.

W. KENNETH LAW, Chief Justice, dissenting.

Few principles are as basic as the general notion that a reviewing court, when reviewing issues of fact, should never substitute its judgment for that of the jury when *some* evidence exists to support the finding made by the jury. Because the majority today violates that principle, I respectfully dissent.

The majority opinion concludes that no rational trier of fact could have found the elements of the offense of disorderly conduct beyond a reasonable doubt by asserting that no evidence exists to support such a finding. *See* Tex. Pen.Code Ann. § 42.01(a)(2) (West 2003). In doing so, the majority strays from the basic mandate that a reviewing court should so find only when the evidence is insufficient as a matter of law to support a finding of guilt and that the issue therefore should never have been submitted to the jury. *See Clewis v. State,* 922 S.W.2d 126, 132 (Tex.Crim.App. 1996).

The penal statute in question provides that "[a] person commits an offense if he intentionally or knowingly: ... makes an offensive gesture or display in a public place, and the gesture or display tends to incite an immediate breach of the peace." Tex. Pen.Code Ann. § 42.01(a)(2) (West 2003). The only element at issue in this case is whether the offensive gesture "tends to incite an immediate breach of the peace." *See id.* Thus, we should not assess the result of the incident, but rather assess the potential for violence as a result of the gesture. Clearly, the state may prohibit speech or conduct which has a tendency to incite or produce immediate violence. *See Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Whether the offensive gesture "tends to incite an immediate breach of the peace" is a question of fact. *See Woods v. State,* 152 Tex.Crim. 338, 213 S.W.2d 685, 687 (1948); *State v. Rivenburgh,* 933 S.W.2d 698, 701 (Tex.App.-San Antonio 1996, no pet.); *Estes v. State,* 660 S.W.2d 873, 875 (Tex. App.-Fort Worth 1983, pet. ref'd) ("We must consider if the gesture in this case, under all of the attendant circumstances, amounted to fighting words."). In determining whether an offensive gesture tends to incite imminent violence, we must "consider the gesture as being directed to an average person" and not the intended recipients. *Estes,* 660 S.W.2d at 875. That the intended recipients did or did not become violent is irrelevant. Rather, we are to consider how the *average* person would have reacted when considering whether the offensive gesture amounted to fighting words. *Id.; see also Johnson,* 491 U.S. at 409, 109 S.Ct. 2533 (stating that the expressive conduct at issue must fall within the narrow class of speech constituting fighting words likely to provoke an average person to retaliate). Of course, the determination of how an average person

would react is properly made by the jury and it "is not the function of this court to substitute its finding for that of the jury." *Estes*, 660 S.W.2d at 875.

Even if the majority's approach—measuring the degree to which the Pastranos reacted to appellant's gesture—were applicable, there is evidence in the record that John Pastrano restrained himself from violence. John Pastrano said he was so angered by the gesture he wanted to defend himself and his wife. If the measure is whether a particular recipient reacted violently, there could be no uniform application of this law because its application would rest on whether there was, in fact, violence and not on whether the speech or conduct would have a tendency to produce violence in the average person. *See Cohen*, 403 U.S. at 20, 91 S.Ct. 1780 (describing fighting words as speech or gestures that, "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"); *Woods*, 213 S.W.2d at 687 (defining disorderly conduct as "acts such as intend to excite violent resentment or to provoke or excite others to break the peace"). The majority's application of the standard would defeat the purpose for the law—to prevent gestures, words, and conduct that incite violence. *See Woods*, 213 S.W.2d at 687.

The majority then commits its second error in conducting its legal sufficiency review of the case at hand. A review of a criminal conviction under a legal sufficiency standard requires a court to consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court must look at all the evidence and consider which evidence supports the verdict. *Clewis*, 922 S.W.2d at 132 n. 10. Of the evidence which tends to support the verdict, the appellate court must determine if that evidence rationally supports a finding of each element of the offense. *Id.* at 132.

In this case, there is ample testimony supporting the jury's conclusion that the offensive gesture, in these circumstances, would tend to incite an average person to immediate violence. John Pastrano was driving in the inside lane of U.S. Highway 183 in Lockhart with his wife, Robin Pastrano. At one point, John looked into his rearview mirror and noticed behind him a white Crown Victoria driven by appellant. John estimated he was traveling fifty miles per hour during the time appellant was behind him. Robin estimated their speed at seventy miles per hour. John testified that appellant was flashing the bright lights of the car on and off and motioning for John to move over. Appellant tailgated the Pastranos, at a distance of two to three feet, for approximately one-quarter mile. John, thinking that he was being pulled over by a police officer, moved into the right lane. Both John and Robin testified that as appellant passed them, he directed the obscene gesture at them.[1]

Appellant admitted that he was the driver of the car tailgating the Pastranos. Appellant said he was running late for his *tae kwan do* class in Lockhart when he came up behind the Pastranos in the left lane of the road. As appellant explained the incident:

> [The Pastranos were] in the passing lane. There was no traffic in the right

---

1. John Pastrano testified that Appellant nearly caused two more accidents after he passed them. Robin Pastrano testified that after Appellant passed them, he moved into the slow lane to pass a tractor trailer then moved back into the fast lane.

lane. I wasn't going to pass him on the right because I've been told that's illegal here. So I pulled up behind him. I didn't get real close to him initially. I gave him time to see my car and pull over. He did not pull over.

I got behind him a little closer and I flashed my lights. I flashed my brights. They don't wig-wag. They just go like this (indicating). And he didn't pull over even after that. I so motioned in my windshield, "Hey, could you please get over?" He eventually pulled over....

Finally, when asked in court if he had told the officer issuing the citation, "Yeah I was on his ass because he was in the left lane and was going slow[,]" Appellant testified, "[t]hat sounds like something I would say." Appellant denied making the gesture.

Given these facts and attendant circumstances, the issue is whether a jury could reasonably find that these circumstances are likely to incite an average person to violence. For the majority to conclude that no rational trier of fact could reach the conclusion reached by this jury is quite simply a substitution of its judgment for that of the jury. Looking at the evidence and attendant circumstances in a light most favorable to the verdict reveals that appellant rode the Pastranos' bumper for a distance of one-quarter mile at a speed somewhere between fifty and seventy miles per hour. Appellant could have passed the Pastranos in the right lane but instead chose to tailgate them and force them over at the risk of an accident. Appellant was so impatient and so unyielding that he began motioning and signaling the Pastranos to pull over. He then pulled alongside of the Pastranos and raised his middle finger in an obscene gesture universally understood to mean "f--- you." Given these facts, a jury could reasonably believe that the gesture, in the context of

its attendant circumstances, would have a tendency to incite immediate violence in an average person.

That these facts and attendant circumstances did not incite the Pastranos to immediate violence is inconsequential, and reversing the verdict premised on the fact that the Pastranos did not retaliate with their own breach of the peace is erroneous. The majority opinion is premised on the following: because the Pastranos were not moved to violence, appellant's gesture did not constitute fighting words. Yet, as the majority opinion correctly sets out, the test is whether the words, "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *See Cohen,* 403 U.S. at 20, 91 S.Ct. 1780; *Virginia v. Black,* 538 U.S. 343, ——, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003).

The facts of this case are distinguishable from the cases in which courts held the evidence failed to support a breach of the peace. In *Cohen,* the Supreme Court reversed a conviction of a man wearing a jacket bearing the words "F--- the Draft" because "[n]o individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult." *Cohen,* 403 U.S. at 21, 91 S.Ct. 1780. In *Cantwell,* the Supreme Court reversed a conviction of members of Jehovah's Witnesses charged with breaching the peace in distributing religious materials because there was no showing that in disseminating the material the appellants were "noisy, truculent, overbearing or offensive." *Cantwell,* 310 U.S. at 309, 60 S.Ct. 900. In *Johnson,* the Supreme Court reversed the conviction of a man accused of burning the American flag because the circumstances surrounding the flag burning indicated that the act was generally directed at inducing a condition of unrest, creating dissatisfaction and

even stirring people to anger about the policies of the federal government. 491 U.S. at 410, 109 S.Ct. 2533. In *Cannon,* the Tenth Circuit reversed the conviction of appellants accused of breaching the peace by carrying signs stating "The Killing Place" outside an abortion clinic. 998 F.2d 867, 873 (10th Cir.1993). The majority cites these opinions for the proposition that conduct that angers some people could not constitute fighting words. Generally, that proposition is true depending on the circumstances, such as where the conduct was intended as an impetus to change. *See Johnson,* 491 U.S. at 410, 109 S.Ct. 2533; *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). *Cannon* does not stand for the general proposition, though, that conduct that angers people to the point of violence is constitutionally protected. A necessary prerequisite to retaliatory violence is anger, so it goes without saying that speech arousing anger may amount to fighting words in some circumstances.

In addition, I believe that the *Rivenburgh* case from the San Antonio Court of Appeals supports my position. *See State v. Rivenburgh,* 933 S.W.2d 698 (Tex.App.-San Antonio 1996, no pet.). In that case, the court upheld a trial court's order suppressing evidence that a woman made a vulgar gesture with her middle finger and mouthed an obscenity toward drivers stopped behind her at a red light in a breach the peace action. *See Rivenburgh,* 933 S.W.2d at 701. *Rivenburgh* is an affirmance of a suppression order and a perfect example of how an appellate court should review a fact finder's conclusion on the issue of whether particular conduct could tend to incite imminent violence. The court of appeals said, "[w]e presume the trial court applied the elements of the offense of disorderly conduct to the facts and found that a prudent man would not believe that Rivenburgh had committed

the offense." *Id.* In addition, "[t]he trial judge was free to disbelieve any or all of the testimony" of the one witness who saw the offensive gesture and heard the obscenities even though there was no indication the witness was, in fact, lying. *Id.* The court concluded that "[t]hough it may even rise to the level of common knowledge that this gesture and these words mouthed by a Texas motorist has led to breaches of the peace and even the loss of life, the trial court could have found that the gesture did not tend to incite an immediate breach of the peace *at this time and place.*" *Id.* (emphasis added).

In our case, the majority concedes that, in some circumstances, appellant's gesture could tend to incite an immediate breach of the peace—but not in this case because the contact was brief, the participants were strangers, and the Pastranos experienced only momentarily feelings of hostility. That an offensive gesture made and similar words mouthed by a Texas motorist might have a tendency to lead to a breach of the peace and even the loss of life at another time and in another place is left open both in *Rivenburgh* and in the majority's opinion—and rightly so. What the majority fails to consider is that once a fact finder has reviewed the evidence, believed the testimony of the witnesses, observed their demeanor, considered the attendant circumstances and concluded that at the time and place in question the defendant did engage in conduct an average person could find would tend to incite an immediate breach of the peace, then a reviewing court must defer to that determination except for instances where no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The majority also relies on the fact that appellant and the Pastranos did not have a face-to-face encounter, stating that more

than an "impersonal, brief encounter" is needed. Left unstated is the supposition that only a face-to-face encounter can provide the scenario needed to produce the setting for an immediate breach. In *Sandul v. Larion*, for example, a man was accused of shouting the words "f--- you" to a group of abortion protesters and giving them the finger as he drove by. 119 F.3d 1250, 1252 (6th Cir.1997). A police officer, who was talking with the protesters on the street when the defendant drove by and was the only witness to the gesture and the only person who heard the epithet, pursued the man and caught up with him at his home. *Id.* After being acquitted of a charge of disorderly conduct, the defendant sued the officer for unlawful arrest. *Id.* The district court granted the officer summary judgment on the false arrest charge finding the officer had probable cause to arrest the defendant and was thus immune from suit. *Id.* The Sixth Circuit, though, noted that an official loses his immunity where a reasonable person would have known the defendant had a "clearly established" right to engage in the challenged conduct. *Id.* at 1254. The Sixth Circuit held that the arresting officer should have known that the defendant's speech was constitutionally protected; consequently, the officer did not qualify for immunity. *Id.* at 1255. The court also concluded the defendant's words were not fighting words because the conduct and speech was shouted from the window of a motorist "traveling at a high rate of speed on the opposite side of the street, a considerable distance away from the protesters to whom the language was directed" and thus could not have had a tendency to incite immediate violence. *Id.* Also relevant to the court's conclusion was the fact that none of the protesters heard the insult or saw the gesture. *See id.*

In the present case, all of the ingredients for immediate violence were present.

Both parties were in automobiles, and both automobiles were traveling in the same direction. Pastrano had the capacity to react immediately by accelerating in pursuit of appellant. One must ignore the reality of modern life to not recognize that many instances of "road rage" begin in just such a manner, and consideration of "road rage" easily could have factored into the thought process of the jury.

The majority cites numerous cases to support the proposition that a face-to-face encounter is required. None of the cited cases dictates that factor as a prerequisite, and a close look at these cases reveals that distinguishing factors are present in each. In *Garvey v. State*, the Tennessee Court of Criminal Appeals reversed a woman's conviction for disturbing the peace by shouting "sooey" to a police officer. 537 S.W.2d 709, 711 (Tenn.Crim.App.1975). The court concluded:

> Under the evidence here, the defendant's conduct (words) did not amount to 'fighting' words as contemplated by the statute. There was no direct, face-to-face conduct or other exigent circumstances here. This word addressed to a police officer trained to exercise a higher degree of restraint than the average citizen would not be expected to cause a breach of the peace.

*Id.* (referring, in part, to *Lewis v. New Orleans*, 408 U.S. 913, 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972) (Powell, J., concurring) (proposing that words spoken by one citizen to another, face-to-face, might, in some circumstances, amount to fighting words but that those same words, in other circumstances, spoken by a citizen to a police officer might not amount to fighting words)).

In *Matter of Welfare of S.L.J.*, the Minnesota Supreme Court reversed the conviction of a fourteen-year-old girl ac-

cused of shouting the words "f— you pigs" to two police officers. *Matter of Welfare of S.L.J.*, 263 N.W.2d 412, 415 (Minn.1978). The reversal of conviction in that case was premised on two grounds: the relevant statute was overbroad and the speech did not rise to the level of fighting words because the attendant circumstances were such that "there was no reasonable likelihood that they would tend to incite an immediate breach of the peace." *Id.* at 420.

In *Hershfield v. Commonwealth*, the Virginia court of appeals reversed the conviction of a man accused of disorderly conduct for telling his neighbor to "go f— yourself." 14 Va.App. 381, 417 S.E.2d 876, 876 (1992). In reversing the conviction, the court looked at the attendant circumstances and noted that when the defendant made the comment at issue he was standing fifty-five to sixty feet away from his neighbor and was separated from her by a chain-link fence. *Id.* at 877. The particular statute at issue stated that "[i]f any person shall, in the presence or hearing of another, curse or abuse such other person, or use any violent abusive language to such person concerning himself or any of his relations, or otherwise use such language, under circumstances reasonably calculated to provoke a breach of the peace, he shall be guilty of a Class 3 misdemeanor." *See id.* Prevailing state supreme court precedent required the confrontation to be "face to face." *See id.* at 878. The court concluded that because an essential element of the offense was "in the presence or hearing of another," the distance separating the neighbors circumstantially precluded immediate violence. *Id.*

As a result, the cases cited by the majority support my contention that whether the offensive conduct constituted fighting words and thus would tend to incite an average person to violence is determined by looking at the attendant circumstances. There are as many cases affirming breach of the peace convictions as there are ones reversing those convictions. Although the majority contends the facts in *Estes* are distinguishable, that case is squarely on point. *See* 660 S.W.2d 873. In *Estes,* the defendant "extended the middle finger of his right hand" a few inches from the school principal's face as he received his high school diploma from the principal. 660 S.W.2d at 874. The majority contends *Estes* is inapplicable because the setting in that case was civil and formal, the gesture was made only inches away from the recipient's face and was prolonged, and the parties were in close proximity to each other and knew each other. *See id.* However, the only circumstance here at odds with *Estes* is whether or not the parties knew each other. And the most significant similarities between the two cases compel a similar outcome. Here, appellant and the Pastranos were only feet away from each other at all times relevant to their encounter. Likewise, unlike the circumstances in *Sandul* and more like the circumstances in *Estes*, Pastrano was in a position, if he chose, to chase appellant down. It is even possible to conclude that, as a jailer in the sheriff's department, Pastrano, like the principal in *Estes* and the police officer in *Lewis*, was self-controlled and able to restrain himself from retaliation.[2] The entire incident spanned fifteen to twenty seconds, given speeds of fifty to seventy-five miles per hour for a distance of a quarter mile. All told, because enough evidence exists for a reasonable jury to believe that the gesture, coupled with its attendant circumstances, would have a tendency to incite immediate vio-

---

**2.** In fact, John Pastrano testified that he re- strained himself from retaliating.

lence in an average person, appellant's arguments should fail to persuade this court to reverse the conviction under a legal sufficiency review.

Appellant also claims that the evidence is factually insufficient to support a conviction for disorderly conduct.[3] A factual sufficiency review considers whether "a neutral review of the evidence, both for and against the finding" shows the evidence to be so obviously weak as to undermine confidence in the jury's determination or that the evidence supporting the conviction is greatly outweighed by contrary proof. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). An appellate court reviews the fact finder's weighing of the evidence. *Id.* The appellate court is then free to disagree with the fact finder's determination. *Clewis,* 922 S.W.2d at 133. Although the appellate court should be properly deferential to the fact finder's judgment so as avoid a substitution of judgment, the court should consider all of the evidence to prevent a "manifestly unjust result." *Id.* at 133, 135. In other words, to find that the evidence is factually insufficient means that the court "determines that the verdict is against the great weight of the evidence ... so as to be *clearly wrong and unjust." Id.* at 135.

I fail to see, given all the evidence available in this case, that appellant's conviction of disorderly conduct resulted in manifest injustice. Although appellant denied making the gesture in question, his testimony was contradicted by both John and Robin Pastrano. He offered no other evidence in support of his assertion. In addition, he readily admitted to all of the "attendant circumstances" that I found compelling in my review of the legal sufficiency of the evidence. As a result, I would find no

basis to determine that a conviction in this case was clearly wrong and unjust. As a result, I would reject appellant's argument that the evidence is factually insufficient to support a conviction and therefore would overrule appellant's fourth issue in its entirety.

Finally, in his fifth issue appellant argues that no probable cause existed for officers to issue a citation. *See Torres v. State,* 868 S.W.2d 798, 801 (Tex.Crim.App. 1993). However, appellant does not cite the record in support of his proposition, nor does he identify what relief he is claiming under this argument. As a result, appellant has not provided sufficient argument for us to reach the merits of the claim. *See* Tex.R.App. P. 38.1(h).

While I concur in the majority's analysis of the first three issues, because I would overrule appellant's legal and factual sufficiency challenges, I would affirm the judgment of the trial court.

I respectfully dissent.

---

**3.** Because the majority reversed the conviction under a legal sufficiency review, it never reached Appellant's factual sufficiency claim

or his fifth issue concerning probable cause for the issuance of the citation.